

UNITED STATES COURT OF INTERNATIONAL TRADE
ONE FEDERAL PLAZA
NEW YORK, NY 10278-0001

CHAMBERS OF
Claire R. Kelly
    Judge

April 19, 2021

Ned Herman Marshak, Esq.
Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP
599 Lexington Avenue
36th Floor
New York, NY 10022
Email:      nmarshak@gdlsk.com

Dharmendra Narain Choudhary, Esq.
Jordan Charles Kahn, Esq.
Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP
1201 New York Avenue, NW
Suite 650
Washington, DC 20005
Email:      dchoudhary@gdlsk.com
            jkahn@gdlsk.com

Robert Ralph Kiepura, Esq.
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Email:      robert.kiepura@usdoj.gov

JonZachary Forbes, Esq.
Rachel A. Bogdan, Esq.
Shelby Mitchell Anderson, Esq.
Of Counsel
U.S. Department of Commerce
Office of Chief Counsel for Trade Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, DC 20230-0001
Email:      jonzachary.forbes@trade.gov
            rachel.bogdan@trade.gov
            shelby.anderson@trade.gov

Roger Brian Schagrin, Esq.
Christopher Todd Cloutier, Esq.
Elizabeth Jackson Drake, Esq.
Geert M. De Prest, Esq.
Kelsey Marie Rule, Esq.
Luke Anthony Meisner, Esq.
Nicholas Joel Birch, Esq.
Paul Wright Jameson, Esq.
William A. Fennell, Esq.
Schagrin Associates
900 Seventh Street, NW
Suite 500
Washington, DC 20001
Email:     rschagrin@schagrinassociates.com
             ccloutier@schagrinassociates.com
             edrake@schagrinassociates.com
             GDePrest@SchagrinAssociates.com
             krule@schagrinassociates.com
             lmeisner@schagrinassociates.com
             nbirch@SchagrinAssociates.com
             pjameson@schagrinassociates.com
             wfennell@schagrinassociates.com

Alan Hayden Price, Esq.
Adam Milan Teslik, Esq.
Christopher Bright Weld, Esq.
Cynthia Cristina Galvez, Esq.
Derick G. Holt, Esq.
Elizabeth Seungyon Lee, Esq.
Jeffrey Owen Frank, Esq.
Laura El-Sabaawi, Esq.
Maureen Elizabeth Thorson, Esq.
Robert Edward DeFrancesco, III, Esq.
Stephanie Manaker Bell, Esq.
Tessa Victoria Capeloto, Esq.
Theodore Paul Brackemyre, Esq.
Timothy C. Brightbill, Esq.
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
Email:     aprice@wiley.law
             ateslik@wiley.law

    cweld@wiley.law
    cgalvez@wileyrein.com
    dholt@wiley.law
    elee@wiley.law
    jfrank@wiley.law
    lel-sabaawi@wiley.law
    mthorson@wiley.law
    rdefrancesco@wiley.law
    sbell@wileyrein.com
    tcapeloto@wileyrein.com
    tbrackemyre@wiley.law
    tbrightbill@wiley.law

 Re: *Garg Tube Export LLP et al v. United States*
    Court No. 20-00026

Dear Counsel:

 As you know, oral argument in this case will be held virtually on Thursday, April 29, 2021, at 9:30 a.m. in Courtroom 1 of the James L. Watson Courthouse of the United States Court of International Trade, One Federal Plaza, New York, NY 10278. The court has examined the parties' submissions and would like counsel to be prepared to address the following issues.

## Lawfulness of Adjustment to Reported Costs

### For Defendant and Defendant-Intervenors

1. How is this case any different from previous decisions of this Court declaring that the U.S. Department of Commerce's ("Commerce") methodology of remedying a cost-based particular market situation ("PMS") by adjusting reported costs for purposes of the sales-below-cost test is unlawful? See <u>Husteel Co. v. United States</u>, 44 CIT __, __, 426 F. Supp. 3d 1376, 1383–89 (2020); <u>Saha Thai Steel Pipe Pub. Co. Ltd. v. United States</u>, 43 CIT __, __, 422 F. Supp. 3d 1363, 1368–70 (2019); <u>Borusan Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. United States</u>, 44 CIT __, __, 426 F. Supp. 3d 1395, 1411–12 (2020).

**PMS Determination**

**For Defendants and Defendant-Intervenors**

1. Why is Commerce's consideration of whether record evidence demonstrates a reversal of "damage inflicted on steel markets in the course of almost two decades" relevant to its inquiry into whether there was a cost-based PMS in India? <u>See, e.g.</u>, [Def.-Intervenors' Joint] Resp. to Mot. J. Agency R. at 22, Jan. 15, 2021, ECF No. 42 ("Def.-Intervenors' Joint Resp. Br.") (quoting Issues and Decision Memo. for the Final Results of Antidumping Duty Admin. Review of Welded Carbon Steel Standard Pipes and Tubes from India at 21, A-533-502, (Jan. 9, 2020), ECF No. 24-5 ("Final Decision Memo")); <u>but see</u> Pls.' Mot. J. Agency R. & accompanying Memo. Supp. Pls.' Mot. at 17, Aug. 17, 2020, ECF No. 33 ("Pls.' Mot." and "Pls.' Br."); Pls.' Reply to Def. & Def.-Intervenors' Resps. to [Pls.' Mot.] at 10, Feb. 26, 2021, ECF No. 49 ("Pls.' Reply Br."). Isn't the relevant consideration whether steel overcapacity caused cost-distortions in the Indian hot-rolled coil ("HRC") market during the period of review ("POR")?

2. Commerce reasons that "[i]ncreases in steel prices do not necessarily mean that the effects from global steel overcapacity have been cured[,]" Final Decision Memo at 20–21 (quoting Memo. Re: Decisions on [PMS] Allegations at 20, PD 209, bar code 3859233-01 (July 10, 2019) ("PMS Memo")),[1] and that a showing that POR pricing levels have "a nexus in a prior period of time is not evidence of price normalization, when the extent of growth in the Indian economy . . . is not taken into account." <u>Id.</u>

    a. If Commerce acknowledges that HRC prices during the POR are comparable to 2013–2014 prices, why is consideration of whether the effects of steel overcapacity "have been cured" relevant to Commerce calculation of the dumping margin?

    b. How does Commerce's position address Plaintiffs' argument that average prices during the POR normalized to pre-2011 levels? <u>See</u> Final Decision Memo at 22 ("HRC prices in India during the POR have failed to normalize to even the 2013–2014 period, much less to levels during the 2009–2013 period of build-up in the global steel overcapacity[.]"); <u>but see</u> Pls.' Reply Br. at 8–9 (citing, <u>inter alia</u>, Rebuttal Resp. to Petitioners' Revised PMS Valuation Methodology at Ex. 2B, CDs 127–28, PD 169, bar codes 3816211-01–2, 3816215-01 (Apr. 8, 2019)) (arguing that record evidence

---

[1] On March 10, 2020, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination. These indices are located on the docket at ECF Nos. 24-2 and 24-1, respectively. All further references to administrative record documents are identified by the numbers assigned by Commerce in those indices and preceded by "PD" and "CD" to denote public or confidential documents.

      demonstrates that prices have normalized to pre-2011 levels); see also Garg Tube's Administrative Case Br. at 20, PD 240, bar code 3884484-01 (Aug. 27, 2019).

3. Rejecting Plaintiffs' argument that "the average unit value for Indian imports of HRC made under HTS heading 7208.39 fell within HRC benchmark prices reported from several sources around the world," Commerce states that such sources are discredited by the fact that global steel overcapacity has "distortive effects on steel markets worldwide[,]" and that "[a] comparison with HRC prices in third countries is not demonstrative that HRC prices in India are not distorted." Final Decision Memo at 26 (citations omitted). What evidence does Commerce cite to support its position that the benchmark prices are distorted? See also, e.g., Pls.' Reply Br. at 12–13 (arguing that the Government impermissibly requires Plaintiffs to prove the negative). Why isn't Commerce's explanation speculative or conclusory?

4. Isn't Commerce's determination that nine percent import penetration constitutes significant exposure to global steel overcapacity so as to justify its PMS finding contradicted by its later determination that nine percent import penetration demonstrates that use of AUV data is insufficient for purposes of its regression analysis? See Def.'s Resp. to [Pls.' Mot.] at 17–18, Jan. 15, 2021, ECF No. 41 ("Def.'s Resp. Br.") (citing Final Decision Memo at 27); but see Pls.' Br. at 20–21; Pls.' Reply Br. at 8, 10; Final Decision Memo at 66 (using domestic HRC prices for the regression analysis because import penetration in India was insignificant). Does any reliance by Commerce on the Government of India's ("GOI") imposition of safeguard duties to justify what appears to be contradictory inferences drawn from the same fact "conflate[ ] two distinct trade remedy mechanisms[?]" Pls.' Reply Br. at 10.

**For Plaintiffs**

1. You maintain that Commerce must adopt a company-specific approach to analyzing the price effects of HRC imports in the Indian market. See, e.g., Pls.' Reply Br. at 8–9. Why is it unreasonable under the statute for Commerce to broaden its analysis to all Harmonized Tariff Schedule subheadings relating to the full range of HRC imports used to produce subject merchandise when inquiring into whether there is a PMS that affects the Indian steel market as a whole? See Def.-Intervenors' Joint Resp. Br. at 25 ("Commerce's analysis is intentionally broad and meant to examine the entire Indian HRC market and not be limited to specific tariff lines."); see also Final Decision Memo at 25.

2. How do you respond to Defendant-Intervenors' argument that Garg Tube Export LLP and Garg Tube Limited's (collectively, "Garg Tube") nonpayment of antidumping and safeguard duties imposed by the GOI demonstrates that those protections are absent

from Garg Tube's cost of production, see Def.-Intervenors' Joint Resp. Br. at 25, and that the GOI's "duty drawback programs allow Indian pipe producers to effectively export the worst of [the] excess capacity effects to their target markets." Id. at 23–24; see also Final Decision Memo at 30 ("The nonpayment of safeguard duties by importers can be evidence of a PMS, especially if the safeguard was put in place effectively to remedy the price distortions and injury in the domestic HRC market caused by global steel overcapacity.") (citations omitted).

3. You cite Certain New Pneumatic Off-the-Road Tires From the People's Republic of China as support for the argument that Commerce is required to perform a double remedy pass-through analysis in this case. Pls.' Br. at 30 (citing 73 Fed. Reg. 40,480 (Dep't Commerce July 15, 2008) (final affirmative countervailing duty determination and final negative determination of critical circumstances) ("OTR Tires from China") and accompanying Issues and Decision Memo. for the [OTR Tires from China] at Cmt. 2, C-570-913, (July 7, 2008), available at https://enforcement.trade.gov/frn/summary/prc/E8-16154-1.pdf (last visited Apr. 19, 2021) ("OTR Tires from China IDM")); see also Pls.' Reply Br. at 12.

   a. The quotation in your brief does not appear in the cited issues and decision memorandum for OTR Tires from China. See generally OTR Tires from China IDM. Did you intend to cite Coated Free Sheet Paper from the People's Republic of China, 72 Fed. Reg. 60,632 (Dep't Commerce Oct. 25, 2007) (final determination of sales at less than fair value) ("CFS from China") and accompanying Issues and Decision Memo. for [CFS from China] at 14, A-570-906, (Oct. 17, 2007), available at https://enforcement.trade.gov/frn/summary/prc/E7-21041-1.pdf (last visited Apr. 19, 2021) ("CFS from China IDM")?

   b. If so, how does an administrative determination discussing a double remedy adjustment support your position that Commerce is required to conduct a pass-through analysis in this case? Pls.' Reply Br. at 12; but see CFS from China IDM at 13–16; see also Def.-Intervenors' Joint Resp. Br. at 27 ("Plaintiffs fail to articulate any legal provision or court precedent that would require Commerce to conduct such an analysis in this context.").

4. As Defendant-Intervenors note, Commerce found that "the PMS Allegation details the subsidy programs that Commerce has found to benefit Indian HRC producers, including domestic subsidies." Final Decision Memo at 28 (citing, inter alia, Letter Re: [PMS] Allegation, Resubmitted Market Viability Allegation, & Supp'n Info. at 18–27, PD 72, bar code 3785365-01 (Dec. 21, 2018) ("PMS Allegation")); see also Def.-Intervenors' Joint Resp. Br. at 26. Why is it unreasonable under the statute for Commerce to infer, based on the administrative findings and other information

> discussed in the PMS Allegation, that subsidized HRC contributes to a finding that a PMS distorted the costs of producing the subject merchandise during the POR? See PMS Allegation at 18–27.

5. Why is it relevant to a PMS finding whether Commerce's determination in the investigation into <u>Circular Welded Non-Alloy Steel Pipe from India</u> was based on facts available with an adverse inference ("AFA")? <u>See</u> Pls.' Reply Br. at 12; <u>see also</u> Section 776 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677e (2018); Final Decision Memo at 28 (citing, <u>inter alia</u>, <u>Circular Welded Carbon-Quality Steel Pipe From India</u>, 77 Fed. Reg. 64,468 (Dep't Commerce Oct. 22, 2012) (final affirmative countervailing duty determination) ("<u>CWP from India</u>") and accompanying Issues and Decision Memo. for [<u>CWP from India</u>] at 22–23, 37, C-533-853, (Oct. 15, 2012), <u>available at</u> https://enforcement.trade.gov/frn/summary/india/2012-25970-1.pdf (last visited Apr. 19, 2021)).[2] Doesn't an AFA determination still require a finding based on record evidence?

## Use of Regression Model to Adjust for PMS

### For Defendant and Defendant-Intervenors

1. Commerce states that "the inverse relationship between steel overcapacity and HRC prices is an empirical fact, as demonstrated by the results of [domestic interested parties'] regression analysis, and there is substantial record evidence supporting this relationship." Final Decision Memo at 68. What record evidence does Commerce cite to support its conclusion that there is an inverse relationship between overcapacity and domestic HRC prices during the POR?

2. Plaintiffs complain that Commerce's regression analysis "is beset with multiple infirmities[.]" Pls.' Br. at 32–36. Please explain each step of Commerce's regression analysis, and how Commerce supports its methodology with substantial evidence.

### For Plaintiffs

1. Why is it unreasonable for Commerce to infer, "based on ten years of high quality, publicly available global and country-specific data from reliable sources," Def.-Intervenors' Joint Resp. Br. at 29 (citing Revised PMS Valuation Methodology, PDs 152–164, CDs 107-126, bar codes 3810691-01–13, 3810640-01–20 (Mar. 22, 2019)), that an inverse relationship continues to exist between global steel overcapacity and domestic HRC prices in India—notwithstanding findings from the study you cite? <u>See</u>

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

      Pls.' Br. at 34 (citing Letter Re: Rebuttal Resp. to Petitioners' PMS Allegations at 81–83 & Ex. 28, PD 142–46, CDs 102–06, bar codes 3799508-01–05, 3799493-01–05 (Mar. 4, 2019)).  Aren't you asking the court to re-weigh the evidence?

2. Isn't it the case that Garg Tube did not provide an alternative regression model(s) of its own?  Final Decision Memo at 64.  Why shouldn't the court defer to Commerce's finding that the "[domestic interested parties'] regression models provide the only means to quantify a distortion in HRC prices that Commerce finds to have existed in India during the POR, as a result of a PMS."  Id.

**Application of Partial AFA**

**For Defendant and Defendant-Intervenors**

1. Defendant appears to suggest that Commerce is applying 19 U.S.C. § 1677e(b) against Garg Tube.  See, e.g., Def.'s Resp. Br. at 6, 34, 38–39.  Where does Commerce state that it is applying 19 U.S.C. § 1677e(b) against Garg Tube?  Where does Commerce make clear whether it is acting under subsection (a) or (b) to calculate Garg Tube's dumping margin?

2. Commerce invokes Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States as controlling judicial precedent governing its application of partial AFA.  See, e.g., Final Decision Memo at 39–41 (citing 753 F. 3d 1227, 1233–36 (Fed. Cir. 2014) ("Mueller")).

    a. If Commerce is applying 19 U.S.C. § 1677e(a), why is dicta from Mueller stating that Commerce is not barred from "drawing adverse inferences against a non-cooperating party that have collateral consequences for a cooperating party" relevant?  753 F.3d at 1236.  How does calculating the partial AFA rate based on the "home market sale on which [Garg Tube] realized the largest loss" further the predominant interest in accuracy?  Compare Final Decision Memo at 32 with Canadian Solar Int'l Ltd. v. United States, 43 CIT __, __, 415 F. Supp. 3d 1326, 1334 (2019).

    b. If Commerce is applying 19 U.S.C. § 1677e(b), how is Mueller applicable?  Where does Commerce discuss whether Garg Tube is a cooperating party under 19 U.S.C. § 1677e and why is it reasonable to use an adverse inference, pursuant to subsection (b), to calculate Garg Tube's missing cost information based on the failure of its unaffiliated suppliers to act to the best of their ability?

3. Plaintiffs argue that, in an attempt to convince its supplier to cooperate, Garg Tube sent several emails, made several phone calls, and held personal meetings—culminating in eventual cancellation of pending orders and threats to drop the uncooperative party as a supplier.[3] Pls.' Reply Br. at 18–19. How do you respond to Plaintiffs' position that Commerce's determination is unreasonable because record evidence shows "[t]here is nothing more that [Garg Tube] could have done"? Id. at 18.

**For Plaintiffs**

1. Defendant-Intervenors argue that you only challenge Commerce's application of partial AFA with respect to one of your suppliers. See Def.-Intervenors' Joint Resp. Br. at 36. Do you concede that you did not attempt to induce the cooperation of the other uncooperative supplier?

        Sincerely,

        /s/ Claire R. Kelly
        Claire R. Kelly, Judge

Cc: Steve Taronji
    For docketing

---

[3] The specifics of Garg Tube's attempts are left out to avoid unnecessary disclosure of confidential information.