Slip Op. 21-83

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GARG TUBE EXPORT LLP and GARG TUBE LIMITED,** | |
| **Plaintiffs,** | |
| **v.** | Before: Claire R. Kelly, Judge |
| **UNITED STATES,** | |
| **Defendant,** | Court No. 20-00026 |
| **and** | PUBLIC VERSION |
| **WHEATLAND TUBE and NUCOR TUBULAR PRODUCTS INC.,** | |
| **Defendant-Intervenors.** | |

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's final determination in the 2017–2018 administrative review of the antidumping duty order covering welded carbon steel standard pipes and tubes from India.]

Dated: July 9, 2021

Ned H. Marshak and Dharmendra N. Choudhary, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, argued for plaintiffs Garg Tube Export LLP and Garg Tube Limited. Also on the briefs was Jordan C. Kahn.

Robert R. Kiepura, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. Also on the brief were Jennifer B. Dickey, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director. Of counsel was Rachel A. Bogdan, JonZachary Forbes, and Shelby M. Anderson, Attorneys, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Robert E. DeFrancesco, III</u> and <u>Theodore P. Brackemyre</u>, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor Nucor Tubular Products Inc.  Also on the brief were <u>Alan H. Price</u> and <u>Cynthia C. Galvez</u>.

<u>Roger B. Schagrin</u>, Schagrin Associates, of Washington, DC, for defendant-intervenor Wheatland Tube.  Also on the brief were <u>Christopher Cloutier</u>, <u>Elizabeth J. Drake</u>, and <u>Luke A. Meisner</u>.

Kelly, Judge:  Before the court is Plaintiffs Garg Tube Export LLP and Garg Tube Limited's (collectively, "Garg") motion for judgment on the agency record, challenging aspects of the U.S. Department of Commerce's ("Commerce") final determination in its 2017–2018 administrative review of the antidumping duty ("ADD") order covering welded carbon steel standard pipes and tubes ("CWP") from India.  <u>See</u> Pls.' Mot. J. Agency R. & accompanying Supp. Memo. Confidential Version, Aug. 17, 2020, ECF No. 32 ("Pls.' Mot." and "Pls.' Br.", respectively); <u>see also</u> [CWP] From India, 85 Fed. Reg. 2715 (Dep't Commerce Jan. 16, 2020) (final results of [ADD] admin. review; 2017–2018) ("<u>Final Results</u>") and accompanying Issues and Decision Memo., A-533-502, (Jan. 9, 2020), ECF No. 24-5 ("Final Decision Memo").  Garg challenges as unsupported by substantial evidence Commerce's finding that a particular market situation ("PMS") in India distorts the cost of producing CWP, <u>see</u> Pls.' Br. at 4–32, as well as Commerce's methodology for calculating the PMS adjustment.  <u>See</u> <u>id.</u> at 32–36.  Moreover, Garg challenges as contrary to law Commerce's application of the PMS adjustment to Garg's reported costs for purposes of examining whether Garg's home market sales of CWP were made below the cost of production.  <u>See</u> <u>id.</u> at 36–38.  Finally, Garg challenges as unlawful Commerce's

application of partial facts available with an adverse inference ("AFA")[1] in response to its unaffiliated suppliers' refusal to cooperate with Commerce's requests for information during the administrative review.  See id. at 38–49.  For the following reasons, Commerce's final determination is remanded for further explanation or reconsideration.

## BACKGROUND

On July 12, 2018, in response to timely requests from interested parties, Commerce initiated an administrative review of the ADD order covering certain CWP from India, the period of review ("POR") covering May 1, 2017 through April 30, 2018. See generally Initiation of Antidumping and Countervailing Duty Administrative Reviews, 83 Fed. Reg. 32,270, 32,270 (Dep't Commerce July 12, 2018).  Finding it impractical to subject all companies to individual review,[2] Commerce limited its

---

[1] Parties and Commerce sometimes use the shorthand "adverse facts available" or "AFA" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination. However, AFA encompasses a two-part inquiry pursuant to which Commerce must first identify why it needs to rely on facts otherwise available, and second, explain how a party failed to cooperate to the best of its ability so as to warrant the use of an adverse inference when "selecting among the facts otherwise available." See 19 U.S.C. § 1677e(a)–(b).

[2] Commerce is generally required to calculate individual weighted-average dumping margins for each known exporter and producer of the subject merchandise. 19 U.S.C. § 1677f-1(c)(1).  However, Commerce may limit its examination to a reasonable number of exporters or producers if it determines that it is not practicable to determine individual weighted-average dumping margins "because of the large number of exporters or producers involved in the review." Id. § 1677f-1(c)(2); 19 C.F.R. § 351.204(c)(2) (2019).

examination to Apl Apollo Tubes Limited and Garg[3] as mandatory respondents.  See

Resp't Selection Memo. at 2–4, PD 15, bar code 3743783-01 (Aug. 15, 2018).[4]

    During an administrative review, Commerce calculates the dumping margin

for a respondent's entries of subject merchandise during the POR by comparing prices

for those U.S. sales to their normal value.  See Sections 751 and 773 of the Tariff Act

of 1930, as amended, 19 U.S.C. §§ 1675, 1677b (2018).[5]  Here, Commerce attributed

to Garg sales of certain unaffiliated suppliers of the foreign like product when

determining the normal value of Garg's subject merchandise.[6]  See [CWP] from India,

---

[3] Commerce determined that Garg Tube Export LLP and Garg Tube Limited were affiliated and treated the entities as a single collapsed entity for purposes of Commerce's dumping margin calculation.  See, e.g., Prelim. Decision Memo at 8 (citing 19 U.S.C. § 1677(33)(F); 19 C.F.R. § 351.401(f)).

[4] On March 10, 2020, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination.  These indices are located on the docket at ECF Nos. 24-2 and 24-1.  All references to documents from the public and confidential record are identified by the numbers assigned by Commerce in the March 10th indices, see ECF Nos. 24-2 and 24-1, and preceded by "PD" or "CD" to denote public or confidential documents, respectively.

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

[6] According to Commerce, it may exclude from calculation of a respondent's dumping margin sales of subject merchandise that the respondent purchased from an unaffiliated producer, provided, in relevant part, that the producer knew or should have known the merchandise was going to the United States.  [CWP] from India, 84 Fed. Reg. 33,916 (Dep't Commerce July 16, 2019) (prelim. results of [ADD] admin. review; 2017–2018) ("Prelim. Results") and accompanying Prelim. Decision Memo. at 16, A-533-502, PD 207, bar code 3859225-01 (July 11, 2019) ("Prelim. Decision Memo").  However, Garg reported to Commerce that its unaffiliated suppliers were not aware (nor had any reason to be aware) of the ultimate use or destination of

(footnote continued)

84 Fed. Reg. 33,916 (Dep't Commerce July 16, 2019) (prelim. results of [ADD] admin.

review; 2017–2018) ("Prelim. Results") and accompanying Prelim. Decision Memo. at

16, A-533-502, PD 207, bar code 3859225-01 (July 11, 2019) ("Prelim. Decision

Memo").    On November 30, 2018, Commerce issued to Garg a supplemental

questionnaire requesting, in relevant part, that Garg obtain information from its

unaffiliated suppliers regarding the actual costs of producing the purchased

merchandise.    See Letter Re: Suppl. Questionnaire to Garg's Section A–D Resps. at

12, PD 67, CD 32, bar codes 3778772-01, 3778771-01 (Nov. 30, 2018).

On December 21, 2018,  Independence Tube Corporation and Southland Tube,

Incorporated (collectively "Petitioners")—later consolidated into Nucor Tubular

Products Inc. ("Nucor")[7]—submitted to Commerce an allegation that a PMS in India

distorted the cost of producing CWP during the POR, and furnished information

supporting their submission.    See [PMS] Allegation, Resubmitted Market Viability

Garg's purchases of pipe and tube.  See id. (citing Resp. from [Garg] to [Commerce]
Re: Section A Questionnaire Resp. at 35 & Ex. A-14, PDs 33–36, CDs 7-11, bar codes
3754219-01–04, 3754211-01–05 (Sept. 17, 2018)).  Of the suppliers listed in the
Section A Questionnaire Response, Garg challenges determinations made by
Commerce based on Garg's dealings with [[                                                                                          ]].
See generally Compl., Jan. 30, 2020, ECF No. 6; but see Pls.' Br. At 41–49; see also
Oral Arg., Apr. 29, 2021, ECF No. 62 and accompanying Digital Audio File, Apr. 30,
2021, ECF No. 63.
[7] Defendant-Intervenors state that Independence Tube Corporation and Southland
Tube initially filed written submissions during the underlying administrative review,
and were later consolidated into a single entity—Nucor Tubular Products Inc.  See
[Def-Intervenors' Joint] Resp. to [Pls.' Mot.] Confidential Version at 1 n.1, Jan. 15,
2021, ECF No. 45 (citing Consent Mot. to Intervene as a Matter of Right at 1 n.1, Feb.
28, 2020, ECF No. 17).

Allegation, & Supp. Info., PDs 72–99, CDs 33–61, bar codes 3785365-01–28, 3785322-01–29 (Dec. 21, 2018) ("PMS Allegation").   On February 1, 2019, Petitioners supplemented their PMS allegation.  See Letter Re: Other Factual Info. – Alternative PMS Valuation Calculation, PDs 102–04, CDs 62–68, bar codes 3789235-01–03, 3789217-01–07 (Feb. 1, 2019) ("PMS Allegation Suppl.").   Petitioners proposed various regression models for Commerce to use to quantify any adjustment made to the dumping margin should Commerce determine that a PMS in India distorted the cost of producing CWP in India during the POR.  See, e.g., PMS Allegation Suppl. at 14–17 & Ex. 1.1.

On February 19, 2019, Garg submitted its response to Commerce's initial supplemental questionnaire.   See Resp. to Commerce Re: Section A–D Suppl. Questionnaire, PDs 110–34, CDs 69–101, bar codes 3794286-01–25, 3794250-01–33 (Feb. 19, 2019) ("Garg's Suppl. Resp.").   Pertinent here, Garg detailed unsuccessful efforts to persuade one of its unaffiliated suppliers to provide the cost information requested by Commerce.[8]   See Garg's Suppl. Resp. at 51–53.   On April 30, 2019,

---

[8] Garg explained that it sought to persuade [[         ]] to cooperate by:

> [having] several personal meetings with its senior management, wherein Garg Tube explained in detail the acute necessity to provide the specific CONNUM wise cost of production data and relevant company information . . . communicat[ing] with [[         ]] through numerous emails and telephonic conversations, further elaborating its requirements . . . threaten[ing] to discontinue its ongoing business with

(footnote continued)

Commerce sent a second supplemental questionnaire to Garg, <u>see</u> Letter from Commerce Re: Second Suppl. Questionnaire, PD 173, CD 131, bar codes 3827345-01, 3827342-01 (Apr. 30, 2019), and, on May 2, 2021, Commerce directly requested information from Garg's unaffiliated supplier. <u>See</u> Letter Re: Req. for Cost Info. from Supplier 1, PD 174, CD 132, bar code 3828743-01, 3828737-01 (May 2, 2019). Garg responded to the second supplemental questionnaire on May 16, 2019. <u>See</u> [Garg's] Resp. to Commerce's Second Suppl. Questionnaire, PDs 178–181, CDs 134–141, bar codes 3834711-01–04, 3834703-01–08 (May 16, 2019). Shortly thereafter, Garg submitted to Commerce copies of its communications with the unaffiliated supplier. <u>See</u> Letter from [Garg] Re: Supplier Communications, PD 182, CD 142, bar codes 3836053-01, 3836052-01 (May 20, 2019) ("Garg's Letter"). According to Garg, these email communications document attempts to persuade the unaffiliated supplier to cooperate with Commerce's examination.[9] <u>See</u> Garg's Letter at 1–3.

---

      [[      ]] . . . [and s]imultaneously . . . obtain[ing] [[     ]] financial statements and Cost Audit reports[.]

Garg's Suppl. Resp. at 51 (citations omitted). Garg informed Commerce that, despite these efforts, [[    ]] "finally communicated on December 31, 2018 its inability to comply with the necessary data and information[.]" Garg's Suppl. Resp. at 52 (citation omitted). According to Garg, [[    ]] indicated that "it was not within [its] best interests to [cooperate.]" <u>Id.</u> at 52 (citation omitted).

[9] Exhibit 1 of Garg's submission contains a May 9, 2019 email to [[    ]] "urg[ing] [the company] to respond to [Commerce's questionnaire] and submit the required information directly to [Commerce.]" <u>See</u> Garg's Letter at Ex. 1. Exhibit 3 of Garg's submission contains [[    ]] response, in which the company appears to decline, referring Garg instead to information the supplier already submitted as well as publicly available information, and stating further that the supplier is "not a[n] exporter." <u>See</u> Garg's Letter at Ex. 2.

On July 16, 2019, Commerce published its preliminary determination.  <u>See</u>

<u>generally</u> <u>Prelim. Results</u>, 84 Fed. Reg. 33,916.  Based on evidence cited by Petitioners

in their PMS submissions regarding the collective impact on the Indian market of

global steel overcapacity, Government of India trade interventions, and Garg's non-

payment of antidumping and safeguard duties on imports of hot-rolled coil ("HRC"),

Commerce determined that a PMS in India distorted the cost of producing CWP

during the POR.  <u>See</u> Prelim. Decision Memo at 19–21; <u>see also</u> Memo. Re: Decisions

on [PMS] Allegations at 18–27, PD 209, bar code 3859233-01 (July 10, 2019) ("PMS

Memo").   Commerce accounted for the distortion by upwardly adjusting Garg's

reported costs for HRC, a primary input in the production of subject CWP.   <u>See</u>

Prelim. Decision Memo at 19–21; Memo. Re: Prelim. Analysis for [Garg] at 5–6, PD

212, bar code 3859260-01 (July 10, 2019) ("Prelim. Analysis Memo").   Relevant here,

Commerce made the adjustment for purposes of determining which of Garg's sales

were made below cost.[10]

---

[10] When calculating normal value using home market sales, the statute permits
Commerce to disregard sales made below the cost of production during an extended
period of time and in substantial quantities.  19 U.S.C. § 1677b(b).  Commerce later
states that it "accounts for the cost-based PMS through its adjustment of the
respondent's COPs, which are then reflected in Commerce's dumping calculations,
including in the sales-below-costs test to identify comparison market sales which may
be outside of the ordinary course of trade."   Final Decision Memo at 50.   Garg
challenges Commerce's PMS adjustment in the context of its below cost sales
analysis.  <u>See</u> Compl. ¶ 24, Jan. 30, 2020, ECF No. 6.

Commerce calculated the adjustment by using a regression model provided in Petitioners' PMS submissions.  <u>See</u> Prelim. Analysis Memo at 6 & n. 12 (citing Letter from Petitioners Re: Revised PMS Valuation Methodology, PDs 152–64, CDs 107–26, bar codes 3810691-01–13, 3810640-01–20 (Mar. 22, 2019) ("Revised PMS Methodology Memo")); <u>see also</u> Revised PMS Methodology Memo at 18–22, Ex. 1.1. The regression model, called "Ordinary Least Squares" ("OLS"), seeks to predict a counterfactual AUV for HRC imports into India in 2017, representing what the AUV would be "if the global steel industry had operated at a utilization rate of 85 percent." Revised PMS Methodology Memo at Ex. 1.1.  Regressing data drawn from 38 countries, covering a period from 2008 through 2017, the OLS model predicted that the counterfactual AUV would be "38.54 percent higher than the actual 2017 Indian import AUV of $575.12."  <u>Id.</u>  Thus, Commerce increased the reported costs of Garg's HRC inputs by using an adjustment factor of 38.54 percent.  <u>See</u> Prelim. Analysis Memo at 6 & n. 12 (citing Revised PMS Methodology Memo).

Moreover, when calculating Garg's dumping margin, Commerce purported to apply partial AFA to fill the gap in the record stemming from the refusal of Garg's unaffiliated suppliers to provide the requested cost information.  <u>See</u> Prelim. Decision Memo at 16–17.  Commerce found that Garg's unaffiliated suppliers were interested parties within the meaning of 19 U.S.C. § 1677(9)(A) because "they are producers of pipe and tube, which is merchandise subject to the [ADD] Order."  <u>Id.</u> at 17.  Pursuant to 19 U.S.C. § 1677e(a), Commerce found the unaffiliated suppliers withheld

information, failed to timely provide information, and significantly impeded the investigation because the suppliers "did not provide the cost information at issue[.]" Id. (citing 19 U.S.C. § 1677e(a)(2)(A)–(C)).  Further, Commerce found it "appropriate to resort to partial facts available with adverse inferences regarding said suppliers' missing cost information, pursuant to [19 U.S.C. § 1677e(b)]" when selecting amongst the available facts it would use to calculate surrogate costs because "the suppliers in question, as interested parties to this review, failed to cooperate to the best of their ability in responding to Commerce's requests for information, given that they refused to provide the cost information on two separate occasions." Id.  Commerce calculated surrogate costs for the unaffiliated suppliers' pipe and tube based on Garg's "acquisition costs for the supplier-produced pipe and tube[,] plus amounts for Garg Tube's further processing expenses, general and administrative expenses, and financial expenses, adjusted based on Garg Tube's home market sale on which it realized the largest loss." Id. (citing Prelim. Analysis Memo).

On January 16, 2020, Commerce published the final results of its administrative review.  See Final Results, 85 Fed. Reg. 2715; see also Final Decision Memo.  Commerce continued to quantify the adjustment to HRC costs based on the regression analysis, albeit with certain changes.[11]  See Final Decision Memo at 63–

---

[11] Instead of AUVs of HRC imports into 38 countries (including India), Commerce used an OLS model that regresses domestic HRC prices from eight countries

(footnote continued)

66.  Commerce made no other changes to its preliminary determination that are relevant to this dispute.   Commerce assigned to Garg a weighted-average dumping margin of 11.83 percent.  See Final Results, 85 Fed. Reg. at 2715–16.

On January 30, 2020, Garg commenced this action challenging Commerce's final determination.  See generally Summons, Jan. 30, 2020, ECF No. 1; Compl., Jan. 30, 2020, ECF No. 6.  On August 17, 2020, pursuant to U.S. Court of International Trade Rule 56.2, Garg moved for judgment on the agency record.  See generally Pls.' Mot.  By February 1, 2021, Defendant and Defendant-Intervenors submitted their responses.  See Def.'s Resp. to [Pls.' Mot.] Confidential Version, Jan. 15, 2021, ECF No. 46 ("Def.'s Br."); [Def-Intervenors' Joint] Resp. to [Pls.' Mot.] Confidential Version, Jan. 15, 2021, ECF No. 45 ("Def-Intervenors' Joint Br.").  On February 26, 2021, Garg submitted its reply in support of its motion for judgment.  Pls.' Reply to Def. & Def.-Intervenors' Resps. to [Pls.' Mot.] Confidential Version, Feb. 26, 2021, ECF No. 48.  On April 29, 2021, the court heard oral argument.  See Oral Arg., Apr. 29, 2021, ECF No. 62 and accompanying Digital Audio File, Apr. 30, 2021, ECF No. 63 ("Oral Arg.").

---

(including India).  Final Decision Memo at 65.  Additionally, "rather than calculating a counterfactual Indian HRC import AUV in 2017," Commerce used an "estimated regression coefficient" to calculate the PMS adjustment factor, which it derived from the domestic-price based OLS model.  See id. at 65.  Finally, Commerce adjusted its desired level of uneconomic capacity from 85 percent to 80 percent.  Id.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2018),[12] which grant the court authority to review actions contesting the final determination in an administrative review of an ADD order. The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    Adjustment to Below Cost Sales

Pointing to rulings of this Court, Garg argues that Commerce's adjustment to its reported costs for purposes of determining which of its sales were made below cost contravenes the statute. See Pls.' Br. at 36–38 (citing, inter alia, Husteel Co. v. United States, 44 CIT __, 426 F. Supp. 3d 1376 (2020) ("Husteel"); Saha Thai Steel Pipe Pub. Co. v. United States, 43 CIT __, __, 422 F. Supp. 3d 1363, 1368–69 (2019) ("Saha"); Borusan Mannesmann Boru Sanayi v. Ticaret A.S., 44 CIT __, __, 426 F. Supp. 3d 1395, 1411 (2020) ("Borusan")).    Defendant and Defendant-Intervenors submit that this Court's rulings are not final or binding, and maintain that Commerce has authority to adjust reported costs to account for a PMS when determining which sales to disregard.[13]    See Def.'s Br. at 21–24; Def-Intervenors' Joint Br. at 30–33.

_____

[12] Further citations to Title 28 of the U.S. Code are to the 2018 edition.

[13] This Court has addressed the issue of Commerce's statutory authority to account

(footnote continued)

Defendant-Intervenors add that Garg failed to exhaust its remedies with respect to this point.[14] Def-Intervenors' Joint Br. at 33–35. For the following reasons, Commerce's adjustment to reported costs is remanded for further explanation or reconsideration.

Commerce generally determines the normal value of a respondent's entries of subject merchandise based on the price at which the foreign like product is sold in either the respondent's home market, or a third country comparator market. See 19 U.S.C. § 1677b(a)(1). However, the statute permits Commerce to determine the normal value of the subject merchandise based on a constructed value where there is a PMS that prevents a proper comparison between prices in the foreign market and

---

for a PMS by adjusting the reported costs of a respondent's home market sales for purposes of determining which of those sales were made below cost. See Husteel, 44 CIT at __, 426 F. Supp. 3d at 1383–89; Saha, 43 CIT at __, 422 F. Supp. 3d at 1368–70; Borusan, 44 CIT at __, 426 F. Supp. 3d at 1411–12. Defendant and Nucor acknowledge that this case is not meaningfully different from those previously decided by this Court. See Oral Arg. at 00:02:35–00:04:48 (counsel for Nucor submitting that this case is distinct in its procedural posture because Plaintiffs did not argue the legality of the PMS adjustment in the context of determining costs of production).

[14] With respect to Defendant-Intervenors' argument that Garg failed to exhaust its administrative remedies, see Def-Intervenors' Joint Br. at 33–35, the issue of Commerce's adjustment to Garg's reported costs is a pure legal question. The court has discretion not to require exhaustion of administrative remedies where a pure legal question arises. 28 U.S.C. § 2637(d); see also Agro Dutch Indus. Ltd. v. United States, 508 F.3d 1024, 1029–30 (Fed. Cir. 2007). As explained above, the Court has ruled on Commerce's authority to adjust the reported costs of a respondent's home market sales in order to account for a cost-based PMS under 19 U.S.C. § 1677b(e). Def-Intervenors' Joint Br. at 34. Since the adjustment is unambiguously prohibited by the statute, see, e.g., Husteel, 44 CIT at __, 426 F. Supp. 3d at 1383–89, Defendant-Intervenors' argument that the pure legal exception does not apply is unavailing.

prices for U.S. sales.  <u>See</u> 19 U.S.C. § 1677b(a)(1)(B)(ii)(III), 1677b(a)(1)(C)(iii), 1677b(a)(4), 1677b(e); <u>see also, e.g.</u>, <u>Husteel</u>, 44 CIT at __, 426 F. Supp. 3d at 1382–89.    Parties and Commerce sometimes refer to determinations made under § 1677b(a)(1)(B)(ii)(III) and 1677b(a)(1)(C)(iii) as "sales-based" PMS determinations. <u>See, e.g.</u>, Final Decision Memo at 48; <u>see also, e.g.</u>, <u>Saha Thai Steel Pipe Pub. Co. v. United States</u>, 44 CIT __, 487 F. Supp. 3d 1323, 1329 (2020) ("<u>Saha II</u>").

Commerce determines the constructed value of a respondent's subject merchandise based on the sum of various costs incurred in the production of that merchandise.  <u>See</u> 19 U.S.C. § 1677b(a)(4), (e).  If, however, Commerce determines that a PMS interferes with its calculation of those costs, it may use any reasonable methodology when determining the constructed value of the subject merchandise. <u>See</u> 19 U.S.C. § 1677b(e); <u>see also, e.g.</u>, <u>Husteel</u>, 44 CIT at __, 426 F. Supp. 3d at 1386–67.  Such determinations are sometimes referred to as "cost-based" PMS determinations.  <u>See, e.g.</u>, Final Decision Memo at 50; <u>see also, e.g.</u>, <u>Saha II</u>, 44 CIT at __, 487 F. Supp. 3d at 1329.

Although Commerce may use any reasonable methodology to determine constructed value where a cost-based PMS interferes with its calculations under 19 U.S.C. § 1677b(e), the statute does not empower Commerce to adjust a respondent's reported costs to account for a cost-based PMS when Commerce relies on home

market or third country market sales to determine normal value.[15]  See <u>Husteel</u>, 44

CIT at __, 426 F. Supp. 3d at 1387.  As explained by this court in <u>Husteel</u>:

> the plain language of the statute provides: a definition of normal value
> as based on home market sales, third country sales, or constructed
> value,   19 U.S.C. § 1677b(a)(1), (4);  sales to be disregarded,
> § 1677b(a)(1)(B)(i), (b)(1); available adjustments, § 1677b(a)(6), (7); and,
> alternatives where a PMS prevents a proper comparison between
> normal value and export price or constructed export price,
> § 1677b(a)(1)(B), (C); 1677b(a)(4). The statute separately provides that
> when Commerce is using constructed value and encounters a PMS that

---

[15] Defendant-Intervenors submit that this Court has erred in its analysis of this issue
by failing to properly apply the <u>Chevron</u> framework.  See Oral Arg. at 00:04:53; <u>see
also</u> Def-Intervenors' Joint Br. at 30–33; <u>Chevron, U.S.A., Inc. v. Nat. Res. Def.
Council, Inc.</u>, 467 U.S. 837 (1984) ("<u>Chevron</u>").  Nucor argues that silence in one part
of the statute does not necessarily mean that Congress has affirmatively spoken to
an issue.  See Oral Arg. at 00:04:53–00:07:52 (citing, <u>inter alia</u>, <u>Van Hollen v. FEC</u>,
421 U.S. App. D.C. 36, 811 F.3d 486, 492–95 (2016)).  Nucor observes that the PMS
language under 19 U.S.C. § 1677b(a), which directs Commerce not to use home
market or third country sales where a PMS "prevents a proper comparison" between
those sales and U.S. prices, existed prior to the Trade Preferences Extension Act of
2015's ("TPEA") amendments, and that it is not clear what Commerce means by
"comparison."  See Oral Arg. at 00:07:52–00:10:58.  Nucor submits that the below-
cost sales provision of the statute "rolls into" the normal value and third country
provisions of the statute, and that Congress's use of the ambiguous word
"comparison" could encompass a price-to-price comparison or a price-to-cost
comparison.  See <u>id.</u> at 00:07:52–00:12:15.

  Nucor's submission fails to persuade.  The TPEA's amendments to 19 U.S.C
§§ 1677 and 1677b(e) did not change the wording of 19 U.S.C. § 1677b(a)(1)(B)(i),
which instructs Commerce to determine the normal value of the subject merchandise
based on the "price at which the foreign like product is first sold (or, in the absence of
a sale, offered for sale) for consumption in the exporting country, in the usual
commercial quantities and in the ordinary course of trade and, to the extent
practicable, at the same level of trade as the export price or constructed export
price[.]"  <u>Id.</u>  And although § 1677b(b)(1) directs Commerce to disregard foreign
market sales that "were made at less than the cost of production[,]" nothing in the
statute empowers Commerce to adjust a respondent's reported costs to account for a
PMS without having made a determination to base normal value on constructed
value.

> it may resort to "any other calculation methodology."    19 U.S.C.
> § 1677b(e).

44 CIT at __, 426 F. Supp. 3d at 1387.    Unlike the constructed value provisions of the

statute, Congress has not enacted any amendments to the framework under 19 U.S.C.

§ 1677b for determining normal value based on foreign market sales that would

enable Commerce to make a PMS adjustment to a respondent's reported costs for

purposes of determining whether those sales were made below cost.    See, e.g.,

Husteel, 44 CIT at __, 426 F. Supp. 3d at 1383–89; Saha, 43 CIT at __, 422 F. Supp.

3d at 1368–70; Borusan, 44 CIT at __, 426 F. Supp. 3d at 1411–12.  Thus, Commerce's

adjustment to Garg's reported costs is remanded for further explanation or

reconsideration.    Since the court is remanding Commerce's adjustment to Garg's

reported costs when determining which home market sales were made below cost, the

court does not reach the issue of whether or not Commerce's PMS finding is supported

by substantial evidence.    The court also does not reach the issue of whether

Commerce's methodology for calculating the PMS adjustment is reasonable.

## II.    Partial AFA

Garg argues that Commerce erred in applying partial AFA because the record

shows that there was nothing more it could have done to induce the cooperation of its

unaffiliated supplier, and that valuing the supplier's inputs using Garg's costs would

be a more accurate way to determine whether Garg is dumping.  See Pls.' Br. at 41–

47.    Nonetheless, Garg submits that Commerce failed to justify its decision to

calculate Garg's AFA rate using the home market sale on which it realized the largest

loss.    See id. at 47–49.    Defendant and Defendant-Intervenor contend that

Commerce's application of partial AFA, as well as Commerce's calculation of Garg's

rate, was reasonable in this instance.    See Def.'s Br. at 35–45; Def-Intervenors' Joint

Br. at 35–43.    For the following reasons, Commerce's application of partial AFA and

adjustment to Garg's rate is remanded for further explanation or reconsideration.

During an administrative review, Commerce normally seeks to calculate an

accurate dumping margin based on information submitted by parties.    See Nan Ya

Plastics Corp. v. United States, 810 F.3d 1333, 1344 (Fed. Cir. 2016) ("accurate"

means accurate as a mathematical and factual matter, and thus supported by

substantial evidence).    However, the statute directs Commerce to consider other

available information in certain situations.    See 19 U.S.C. § 1677e; cf., also 19 U.S.C.

§ 1677m.    Under § 1677e(a), Commerce shall use "facts otherwise available" where

information necessary to calculate a respondent's dumping margin is not available

on the record; or, where an "interested party or any other person" withholds

information requested by Commerce, untimely fails to provide such information,

significantly impedes a proceeding, or provides information that cannot be verified,

Commerce shall use "facts otherwise available" in place of the missing information.

See 19 U.S.C. § 1677e(a).    Under § 1677e(b), once Commerce decides to act under

§ 1677e(a), Commerce may then apply "an inference that is adverse to the interests

of that party in selecting from among the facts otherwise available[.]"    Id.

§ 1677e(b)(1).  However, 19 U.S.C. § 1677e(b) requires Commerce to "find[ ] that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information[.]"  Id. § 1677e(b)(1).  A respondent cooperates to the "best of its ability" when it "has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

In some instances, Commerce may use adverse inferences under 19 U.S.C. § 1677e(a).  In Mueller Comercial De Mexico v. United States, the Court of Appeals for the Federal Circuit ("Court of Appeals") held that, when acting pursuant to 19 U.S.C. § 1677e(a), Commerce may incorporate adverse inferences against a cooperative respondent, if doing so will yield an accurate rate, promote cooperation, and thwart duty evasion.  753 F.3d 1227, 1332–36 (Fed. Cir. 2014) ("Mueller").  There, Commerce sought to incorporate adverse inferences against a cooperative respondent under the theory that the cooperative respondent could have induced the cooperation of a supplier that was also a mandatory respondent to the proceeding.  Id. at 1229–30.  The Court of Appeals concluded that Commerce may invoke such rationales under 19 U.S.C. § 1677e(a) but must balance its consideration against its obligation to calculate an accurate dumping margin.  Mueller, 753 F.3d at 1332–36.  If Commerce seeks to induce the cooperation of a non-cooperating supplier through a cooperating party, there must be, for example, substantial evidence that the cooperating party has leverage over the non-cooperating supplier, and that if

Commerce is constrained from employing adverse inferences, the non-cooperating party will have an incentive to evade duties by selling merchandise into the United States through the cooperating party.  See, e.g., Canadian Solar Int'l Ltd. v. United States, 43 CIT __, 415 F. Supp. 3d 1326, 1334–35 (2019).

The court must remand Commerce's determination because it is not discernible from Commerce's analysis how it is applying 19 U.S.C. § 1677e in this instance. Commerce explains that it is defining Garg's unaffiliated supplier as a producer of the foreign like product and an interested party within the meaning of 19 U.S.C. § 1677(9)(A), and that it is "resort[ing] to partial facts available with adverse inferences regarding said suppliers' missing production cost information, pursuant to [19 U.S.C. § 1677e(b)]."  Final Decision Memo at 37.  Then, Commerce cites Mueller as "controlling judicial precedent for the circumstances at hand[.]" Id. at 39; see also, id. at 40 (stating that Commerce's rationale rests on findings in Mueller).  However, Mueller governs Commerce's incorporation of adverse inferences under subsection (a), not subsection (b).  See Mueller, 753 F.3d at 1332–36.  Yet, Commerce later invokes the wording of 19 U.S.C. § 1677e(b) when observing that "[Garg] did not act to the best of its ability in attempting to obtain the suppliers' costs."  Final Decision Memo at 41.  It is unclear whether this statement indicates that Commerce is applying § 1677e(b) against the unaffiliated supplier, against Garg, or whether Commerce here acts pursuant to some other interpretation of 19 U.S.C. § 1677e(b). The court cannot discern Commerce's analytical pathway, and thus Commerce's final

determination cannot be sustained.  See SEC v. Chenery Corp., 332 U.S. 194, 196–97 (1947).

To the extent that Commerce applies 19 U.S.C. § 1677e(a) against Garg, Commerce must do more to support its determination.  Commerce states that a partial AFA rate "potentially induces the cooperation" of Garg's unaffiliated supplier. Final Decision Memo at 40 (quoting Prelim. Decision Memo at 40).  However, Garg proffered evidence that it had insufficient market power to induce the cooperation of the unaffiliated supplier.  See Garg's Suppl. Resp. at Ex. S1-D-2(f) Part-1 at 30, Part-2; Resp. from [Garg] to [Commerce] Re: Section A Questionnaire Resp. at Ex.A-11(b),(d), PDs 33–36, CDs 7-11, bar codes 3754219-01–04, 3754211-01–05 (Sept. 17, 2018) ("Garg's Section A Questionnaire Resp."); see also Garg's Section A Questionnaire Resp. at Part-1. Commerce responds that it is "reasonable to assume that [Garg] maintained sufficient control [over the unaffiliated supplier]" because "it sourced a substantial volume of pipe and tube" from the supplier,  see Final Decision Memo at 40; but whether or not that is a reasonable assumption to make, Commerce should reconcile that assumption with detracting evidence proffered by Garg.  And with respect to Garg's attempts to induce the unaffiliated supplier's cooperation, Garg's Suppl. Resp. at 51, Commerce faults Garg for "merely threaten[ing] once (by e-mail) to cancel all pending orders[.]"  Id. at 41.  However, not only does the record show that Garg took several actions leading up to the email that Commerce singles out and characterizes as a mere threat to cancel all orders, see id. (citing Garg's Suppl.

Resp. at 51), the email itself—which Garg described as an "ultimatum"—appears to be an explicit request to cancel all pending orders with the unaffiliated supplier. <u>See</u> Garg's Suppl. Resp. at 51.

Insofar as Commerce seeks to apply 19 U.S.C. § 1677e(b) to Garg, Commerce simply does not explain whether it is finding that Garg was an uncooperative party during the administrative review.[16] It may be that Commerce's finding that Garg "failed to put forth its maximum efforts in inducing the suppliers in question to cooperate" is the basis for applying AFA against Garg. <u>See</u> Final Decision Memo at 41. However, since Commerce discusses Garg's efforts in the context of applying <u>Mueller</u>'s framework, the court cannot say that it is reasonably discernible either way. <u>Id.</u> If Commerce means to apply § 1677e(b), it must indicate whether Garg was

---

[16] Regarding the requirement under <u>Mueller</u> that Commerce balance its policy considerations against its obligation to calculate an accurate dumping margin for a cooperative party under 19 U.S.C. § 1677e(a), <u>see</u> 753 F.3d at 1332–36, it is unclear whether Commerce's analysis relates to its determination of Garg's normal value, which here Commerce calculates based on home-market sales, <u>see</u> Final Decision Memo at 48–50, or whether it relates to Commerce's apparent decision to calculate a constructed value for Garg's unaffiliated suppliers. <u>See</u> Final Decision Memo at 48 ("Moreover, without the unaffiliated suppliers' costs, we cannot accurately calculate [constructed value] . . . [w]ithout [[         ]] actual costs of production underlying such [constructed value] comparisons, it is unknown whether and to what extent the [constructed value] for such comparisons is accurate."). On remand, if Commerce continues to apply partial AFA, it must clarify its methodology; it must clearly identify to what end it seeks to resort to facts available with an adverse inference. If it is employing partial AFA to calculate Garg's dumping margin, it should clearly explain how using the acquisition costs for the sale upon which Garg realized its largest loss as a surrogate for missing cost information furthers Commerce's predominant interest in calculating an accurate normal value for Garg's sales of subject merchandise. <u>See Mueller</u>, 753 F.3d at 1233.

Court No. 20-00026                                                              Page 22
**PUBLIC VERSION**

a cooperative respondent, and support any such determination with substantial evidence. Commerce's final determination is remanded for further explanation or reconsideration.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's final determination is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint Appendix; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing its remand redetermination.

                                                         /s/ Claire R. Kelly
                                                         Claire R. Kelly, Judge


Dated:          July 9, 2021
                New York, New York