A-533-502
Remand
Slip Op. 21-83
POR:  05/01/17 – 04/30/18
**Public Version**
E&C/OI:  DV

### *Garg Tube Export LLP and Garg Tube Limited v. United States*
### Court No. 20-00026, Slip Op. 21-83 (CIT July 9, 2021)

### FINAL RESULTS OF REDETERMINATION
### PURSUANT TO COURT REMAND

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the United States Court of International Trade

(CIT or Court) in *Garg Tube Export LLP and Garg Tube Limited v. United States*, Court No. 20-

00026, Slip Op. 21-83 (CIT July 9, 2021) (*Remand Order*).  These final results of

redetermination concern the 2017-2018 antidumping duty administrative review of welded

carbon steel standard pipes and tubes (pipe and tube) from India.[1]  The respondents and plaintiffs

are Garg Tube Export LLP and Garg Tube Limited (collectively, Garg Tube).

In the underlying administrative review, Commerce found that a particular market

situation (PMS) existed in India concerning the cost of hot-rolled coil (an input into subject pipe

and tube) and adjusted Garg Tube's reported cost of production (COP) to account for this PMS.[2]

Separately, Garg Tube purchased subject merchandise from several unaffiliated suppliers and

Commerce requested COP information from two of Garg Tube's unaffiliated suppliers of pipe

and tube, in response to which each supplier refused to provide the requested COP information.

---

[1] *See Welded Carbon Steel Standard Pipes and Tubes from India:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 2715 (January 16, 2020) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Final Results* IDM at Comment 1.

In the absence of COP information for the pipe and tube produced by these suppliers, and relying upon the U.S. Court of Appeals for Federal Circuit's (Federal Circuit) decision in *Mueller*,[3] Commerce filled the gap in the record (*i.e.*, the missing COP data of these suppliers) using Garg Tube's reported COP for the supplier-produced pipe and tube (which includes Garg Tube's acquisition costs, further processing, general and administrative expenses and financial expenses), adjusted based on Garg Tube's sale of the supplier-produced pipe and tube which realized the largest loss.[4]

In its *Remand Order*, the CIT held that Commerce is not authorized under the statute to make a PMS adjustment to a respondent's COP for purposes of determining which of its home market sales were made below cost.[5] The CIT, thus, remanded Commerce's PMS adjustment to Garg Tube's COP for further explanation or reconsideration.[6] Also, regarding Commerce's application of partial adverse facts available (AFA) due to the non-cooperation of one of Garg Tube's suppliers,[7] the CIT held that it was not reasonably discernable from Commerce's analysis in the *Final Results* how it was applying partial AFA under section 776 of the Tariff Act of 1930, as amended (the Act).[8] The CIT further held that to the extent Commerce determined the missing COP data for the unaffiliated suppliers under section 776(a) of the Act, Commerce needed to "do more to support its determination."[9] On this basis, the CIT remanded Commerce's

---

[3] *See Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227 (CAFC 2014) (*Mueller*).
[4] *See Final Results* IDM at Comment 2.
[5] *See Remand Order* at 14-16.
[6] In so finding, the CIT did "not reach the issue of": (1) whether Commerce's PMS finding is supported by substantial evidence; and (2) whether Commerce's methodology for calculating the PMS adjustment is reasonable. *Id.* at 16.
[7] In the *Final Results*, Commerce found that two of Garg Tube's suppliers failed to cooperate with Commerce's information requests. Garg Tube challenges the *Final Results* only with respect to one of these companies, as is described further below.
[8] *Id.* at 19-20.
[9] *Id.* at 20-21.

application of partial AFA and PMS adjustment in Garg Tube's margin calculations for further explanation or reconsideration.[10]

In these final results of redetermination, Commerce continues to find that a PMS existed in India during the period of review (POR) that distorted the price of hot-rolled coil, the principal material input for the production of the subject merchandise and a significant component of the COP of the subject merchandise. Nevertheless, because the CIT held that Commerce is not authorized under the statute to make a PMS adjustment to a respondent's COP for purposes of the sales-below-cost test, under respectful protest, we recalculated Garg Tube's weighted-average dumping margin with no PMS adjustment to Garg Tube's COP for purposes of the sales-below-cost test. As detailed below, we continue to apply a PMS adjustment when calculating the costs of production where normal value is based on constructed value, in accordance with section 773(e) of the Act.

With respect to the issue of Garg Tube's unaffiliated, non-cooperative supplier, in accordance with the Court's *Remand Order*, Commerce clarifies that it is operating under section 776(a) of the Act to determine the COP for the pipe and tube acquired by Garg Tube from this unaffiliated supplier. Moreover, as described below, we find that we are unable to demonstrate on the record of this review that Garg Tube has sufficient "market power" or "leverage"[11] over its unaffiliated supplier to induce the supplier's cooperation. Therefore, under respectful protest, we have modified our calculations for Garg Tube by relying on neutral facts available to fill the gap in the COP data caused by the supplier's non-cooperation.

---

[10] *Id.* at 22.
[11] *See Remand Order* at 18, 20.

## II.    FINAL RESULTS OF REDETERMINATION

Pursuant to the CIT's *Remand Order*, and under respectful protest, Commerce preliminarily recalculated the weighted-average dumping margin for Garg Tube without making an adjustment to account for the PMS concerning the input costs for hot-rolled coil for purposes of the sales-below-cost test; however, we applied a PMS adjustment when calculating the costs of production where normal value was based on constructed value under section 773(e) of the Act.[12]  Commerce also modified its calculation methodology with respect to Garg Tube's sales for which the merchandise under consideration was produced by the unaffiliated, uncooperative supplier at issue in the litigation (*i.e.*, "Company A" or [     ])[13] by relying on the reported acquisition costs for pipe and tube that Garg Tube sourced from [     ] as a substitute for the supplier's missing COP information.  Based on this adjustment, we are no longer relying on adverse inferences pursuant to section 776(a) of the Act in the manner contemplated by *Mueller*.

***Particular Market Situation***

1.    <u>Legal Framework</u>

Section 504 of the Trade Preferences Extension Act of 2015 (TPEA) added the concept of PMS in the definition of the term "ordinary course of trade," and for purposes of constructed value under section 773(e) of the Act.[14]  Section 773(e) of the Act states that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the

---

[12] *See* Memorandum, "Welded Carbon Steel Standard Pipes and Tubes from India:  Draft Results of Redetermination Calculation Memorandum for Garg Tube Export LLP and Garg Tube Limited," dated September 9, 2021 (Garg Tube's Draft Redetermination Calculation Memorandum).

[13] Garg Tube challenged the *Final Results* only with respect to [     ].  As such, Commerce is not reconsidering its AFA determination with respect to the other non-cooperative supplier (*i.e.*, "Company B" or [     ]) identified in the *Final Results*.

[14] *See Trade Preferences Extension Act of 2015*, Pub. L. No. 114-27, 129 Stat. 362 (2015) (TPEA).

administering authority may use another calculation methodology under this subtitle or any other calculation methodology."  Although the Act does not define "particular market situation," the Statement of Administrative Action (SAA) explains that examples where such a situation may exist include "where there is government control over pricing to such an extent that home market prices cannot be considered competitively set."[15]

Section 504 of the TPEA also amended the Act to provide Commerce with additional discretion when applying the PMS concept to determine normal value.[16]  Specifically, in section 504 of the TPEA, Congress added the PMS concept to sales and transactions that Commerce will consider outside the "ordinary course of trade," and thus not usable in its antidumping calculations.  Under section 771(15) of the Act, Commerce shall find "sales and transactions" to be "outside the ordinary course of trade" in situations in which it "determines that the particular market situation prevents a proper comparison with the export price or constructed export price."[17]

Further, section 504 of the TPEA amended the constructed value provision in section 773(e) of the Act by permitting Commerce to use alternative cost calculation methodologies upon a particular market situation finding.  Under section 773(e) of the Act, when Commerce, in calculating constructed value, finds that a "particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade," Commerce "may use another calculation methodology under this part or any other calculation methodology."

---

[15] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol 1 (1994) at 822.
[16] *See* TPEA.
[17] *Id*.

2.   Background

In the *Final Results*, Commerce found the existence of a PMS in India that distorted the prices of hot-rolled coil in the Indian market based on the collective impact of the continued effects of the global steel overcapacity, the Government of India (GOI)'s subsidization of hot-rolled coil, the GOI's findings that imports are unfairly traded, and the non-payment of antidumping or safeguard duties on imports of hot-rolled coil.[18]   Accordingly, Commerce accounted for this distortion by making an upward adjustment to Garg Tube's reported cost of hot-rolled coil – an input used to produce pipe and tube – for purposes of determining the normal value of Garg Tube's sales of pipe and tube.[19]   When determining the normal value of Garg Tube's U.S. sales of pipe and tube, Commerce relied on either:  (1) home market prices after applying the sales-below-cost test which included a PMS adjustment to Garg Tube's reported costs of production; or (2) constructed value which included a PMS adjustment to Garg Tube's reported costs of production.[20]   Commerce quantified the impact of the PMS by the adjustment factor derived from a regression analysis placed on the record by the domestic interested party.[21]

Garg Tube appealed Commerce's determination to the CIT, arguing that Commerce lacked the statutory authority to adjust its reported costs for purposes of the sales-below-cost test. Garg Tube also challenged the *Final Results* on substantial evidence grounds, claiming that Commerce failed to adequately support its finding that a PMS existed with respect to hot-rolled coil costs in India and that Commerce's method of adjusting for the PMS was unsupported.[22]

---

[18] *See Final Results* IDM at Comment 1.

[19] *Id.* at Comment 7.

[20] *See* Memorandum, "Administrative Review of the Antidumping Duty Order on Welded Carbon Steel Standard Pipes and Tubes from India:  Final Analysis Memorandum for Garg Tube Export LLP and Garg Tube Limited; 2017-2018," dated January 9, 2020 (Final Analysis Memorandum) at 288 (containing the log of the margin calculation program providing statistics on the type of normal value comparisons).

[21] *See Final Results* IDM at Comment 7.  Domestic interested parties are Independence Tube Corporation and Southland Tube, Incorporated (Nucor companies).

[22] *See Remand Order* at 12, 16.

3.   Remand Order

In the *Remand Order*, the CIT held that, "{a}lthough Commerce may use any reasonable methodology to determine constructed value where a cost-based PMS interferes with its calculations under {section 773(e) of the Act}, the statute does not empower Commerce to adjust a respondent's reported costs to account for a cost-based PMS when Commerce relies on home market or third country market sale{} {prices} to determine normal value."[23]  The CIT reasoned that, while "{section 773(b)(1) of the Act} directs Commerce to disregard foreign market sale{} {prices} that 'were made at less than the cost of production,' nothing in the statute empowers Commerce to adjust a respondent's reported costs to account for a PMS without having made a determination to base normal value on constructed value."[24]  The CIT concluded that, "{u}nlike the constructed value provisions of the statute, Congress has not enacted any amendments to the framework under {section 773 of the Act} for determining normal value based on foreign market sale{} {prices} that would enable Commerce to make a PMS adjustment to a respondent's reported costs for purposes of determining whether those sale{} {prices} were made below cost."[25]  The CIT thus remanded Commerce's adjustment to Garg Tube's "reported costs when determining which home market sale{} {prices} were made below cost" for further explanation or reconsideration.[26]  Finally, the CIT declined to reach the issues of whether Commerce's PMS finding is supported by substantial evidence or whether Commerce's methodology for calculating the PMS adjustment is reasonable.[27]

---

[23] *Id.* at 14-15.
[24] *Id.* at 15, n.15.
[25] *Id.* at 16.
[26] *Id.*
[27] *Id.*

4.   <u>Analysis</u>

Pursuant to the CIT's finding that Commerce is prohibited under the statute from adjusting a respondent's costs to account for a cost-based PMS when relying on home market sale prices to determine normal value, Commerce removed the PMS adjustment to Garg Tube's costs of production for purposes of the sales-below-cost test.  Nonetheless, Commerce continues to apply the PMS adjustment for normal value based on constructed value, in accordance with section 773(e) of the Act.  Commerce, thus, in accordance with the CIT's order, is unable on remand to provide a full remedy to address the cost-based PMS found in this administrative review, contrary to the statutory intent of Congress.  For this reason, we are issuing these final results of redetermination under respectful protest.

Consistent with section 771(15)(C) of the Act, Commerce found that a cost-based PMS existed during the POR, which distorted the cost of hot-rolled coil used in the production of the merchandise in India.[28]  As summarized above, under the TPEA, Congress provided that, when Commerce determines that a cost-based PMS existed during the period under examination, Commerce may, in accordance with section 773(e) of the Act, remedy the cost-based PMS through "any other calculation methodology."  Although the CIT has held that Commerce may not make a PMS adjustment for purposes of the sales-below-cost test, Commerce observes that if a PMS existed, that PMS by definition results in distorted costs incurred by the producer of the merchandise at issue.

In this review, the distorted production costs incurred by the producer were for the purchase of the hot-rolled coil, the principal material input and cost component for pipe and tube.  Those distorted costs are part of the producer's overall COP of the pipe and tube in

---

[28] *See Final Results* IDM at Comment 1.

India, which means that if Commerce uses those distorted costs in its sales-below-cost test, absent an adjustment, the resulting comparison is between home market sales prices and the distorted costs of producing the merchandise.  Such distorted comparisons will cumulate in inaccurate results of the sales-below-cost test which will also be reflected in the calculation of the weighted-average dumping margin.

Respectfully, we do not believe that such an outcome was intended by Congress when it amended the statute to:  (1) allow Commerce to determine if a PMS which distorts the costs of production existed; and then (2) provide a remedy to that PMS.  Nonetheless, because the CIT has held that Commerce is not permitted to adjust the reported costs of production, based on the PMS finding, for purposes of the sales-below-cost test,[29] we revised our calculations consistent with that directive but are issuing these final results of redetermination under respectful protest.

After making these revisions to the sales-below-cost test, we note that there are still certain CONNUMs[30] sold in the United States for which there are no home market sale prices of identical or a similar CONNUM on which to base normal value.  Therefore, for U.S. sales of such CONNUMs, we relied on constructed value as the basis for normal value in accordance with section 773(e) of the Act.[31]  Constructed value is normally calculated based on the sum of the respondent's cost of manufacturing (*i.e.*, the cost of materials, labor, overhead, general and administrative expenses, financial expenses) plus, based on home

---

[29] *See Remand Order* at 14-16.

[30] The product control number (CONNUM) is the concatenation of the codes for the physical characteristics used to define the subject merchandise and the foreign like product.  *See Welded Carbon Steel Standard Pipes and Tubes from India:  Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 33916 (July 16, 2019), and accompanying Decision Memorandum at 12.

[31] There were [       ] U.S. sales (of a total of [    ], or approximately [    ] percent) for which constructed value was used.  *See* Garg Tube's Draft Redetermination Calculation Memorandum at PDF page 278 (containing log of the margin calculation program providing statistics on the type of normal value comparisons).

market sales, amounts for selling expenses and profit.[32]  However, where Commerce finds

that a PMS existed in the home market that distorts the costs of production, Commerce may

"use any reasonable methodology" to adjust for this PMS when determining the cost of

manufacture of the subject merchandise.[33]  Because the CIT agrees that this is an appropriate

adjustment under the statute, we continue to apply a PMS adjustment when calculating cost

of manufacture where normal value is based on constructed value.

The facts and reasoning supporting the continued application of this PMS adjustment

were discussed at length in the *Final Results*[34] and are unchanged as a result of these final

results of redetermination.  Moreover, because the CIT declined to reach Garg Tube's

arguments regarding whether Commerce's PMS finding and resulting adjustment were

supported by substantial evidence, we find that this issue is not before Commerce on remand.

As such, we have not reconsidered or addressed the arguments regarding these findings in the

context of these final results of redetermination.

### *AFA for Non-Cooperating Supplier*

1. <u>Legal Framework</u>

Section 776(a) of the Act directs Commerce to use the facts otherwise available if

necessary information is not available on the record or an interested party (or any other person)

withholds information that has been requested, fails to provide such information by the deadline

for submission, significantly impedes a proceeding, or provides such information but the

information cannot be verified.

Section 776(b) of the Act provides that, if Commerce finds that an interested party failed

---

[32] *See generally,* section 773(e) of the Act.
[33] *See Remand Order* at 14; *see also* section 773(e) of the Act.
[34] *See generally, Final Results* IDM at Comment 1.

10

to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference adverse to the interests of that party in selecting the facts otherwise available.  In so doing, Commerce is not required to determine, or make any adjustments to, a weighted-average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.[35]

The SAA explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[36]  The purpose of an adverse inference is "to provide respondents with an incentive to cooperate" with Commerce's investigation.[37]  Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts available is an important one.[38]

As described in more detail below, in *Mueller*, the Federal Circuit held that Commerce, in selecting from among facts available to calculate a cooperative respondent's weighted-average dumping margin, may consider an adverse inference against non-cooperative suppliers (who failed to report production costs used in calculating the respondent's weighted-average dumping margin) in certain circumstances.  The Federal Circuit in *Mueller* addressed a scenario where Commerce used an adverse inference to calculate the surrogate production cost for an uncooperative supplier and used the resulting surrogate cost in calculating the cooperative respondent's weighted-average dumping margin.[39]  Specifically, Commerce used the "three highest margin transactions" of the available COP data submitted by one supplier, TUNA, as a

---

[35] *See* section 776(b)(1)(B) of the Act.
[36] *See* SAA at 870; *see also Certain Polyester Staple Fiber from Korea:  Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 69663, 69664 (December 10, 2007).
[37] *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (CAFC 2012).
[38] *Id.*
[39] *See Mueller*, 753 F.3d at 1232.

surrogate for another supplier's missing data, Ternium, in calculating the weighted-average

dumping margin for Mueller, a cooperating mandatory respondent.[40]  Although the Federal

Circuit observed that Commerce was "acting primarily under subsection (a) {of section 776} in

setting a margin for Mueller," the Federal Circuit "conclude{d} that Commerce may rely on such

policies {as deterrence and evasion considerations} as part of a margin determination for a

cooperating party... as long as the application of those policies is reasonable on the particular

facts and the predominant interest in accuracy is properly taken into account...."[41]

Therefore, in calculating the weighted-average dumping margin for a cooperative

respondent, Commerce properly draws an adverse inference against a non-cooperative interested

party to fill gaps in the record resulting from the non-cooperative party's failure to provide

requested information, and Commerce may consider the gap-filling information as part of the

margin calculations for a cooperative respondent.  In so doing, Commerce may rely on policies

of deterring non-cooperation and duty evasion.  A remedy that collaterally impacts a cooperative

mandatory respondent has the potential to account for evasion and encourage cooperation.

2.  Background

In the *Final Results*, Commerce found that partial AFA was warranted with respect to

COP information from Company A (*i.e.*, [       ]) and Company B, which had been requested by

Commerce first from Garg Tube, and second directly from each producer.  In particular,

Commerce explained that these suppliers were producers of the merchandise under

consideration and, as such, their COP information was needed to calculate COP and constructed

value.[42]  Commerce further found that the producers in question (including, as is relevant here,

---

[40] *Id.*
[41] *Id.* at 1233.
[42] *See Final Results* IDM at 36.

[      ]) withheld the necessary COP information, failed to provide the information within the established deadline, and significantly impeded the review within the meaning of sections 776(a)(1) and (a)(2)(A)-(C) of the Act.  In selecting from among the facts available, Commerce determined that an adverse inference was warranted pursuant to section 776(b) of the Act because the producers in question failed to cooperate to the best of their ability in providing the COP information.

Using partial AFA, Commerce calculated surrogate costs in place of the missing COP information based on Garg Tube's reported COP for the supplier-produced pipe and tube (which includes Garg Tube's acquisition costs, further processing, general and administrative expenses and financial expenses), adjusted based on Garg Tube's sale of the supplier-produced pipe and tube which realized the largest loss.[43]  Commerce explained that this methodology comported with "controlling judicial precedent" from the Federal Circuit in *Mueller* because it: (1) potentially induced the cooperation of Garg Tube's suppliers and induced Garg Tube in the future to source pipe and tube from suppliers who would cooperate and provide Commerce with their costs of production; and (2) was "accurate" insofar as the AFA-based costs were "precisely proportional to the missing cost information and, in this instance, relies upon data provided by Garg Tube with respect to COP as well as losses on home market sales of pipe and tube."[44]

As noted above, Commerce's application of AFA to Company B is not part of the scope of this litigation, and as such, Commerce continues to apply AFA to the missing COP information from Company B.  As to Commerce's finding regarding Garg Tube's ability to induce the cooperation of [      ], Commerce found that it was "reasonable to assume that Garg

---

[43] *Id.* at 39.
[44] *Id.*

Tube maintained sufficient control" over [      ] because Garg Tube "sourced a substantial

volume of pipe and tube" from [      ] and [      ] did not itself export subject merchandise

during the POR to the United States (meaning that its non-cooperation might deprive [      ] of

access to a "lucrative market").[45]   Commerce further determined that Garg Tube "failed to put

forth its maximum efforts in inducing {[      ]} to cooperate by providing the" requested COP

information, insofar as Garg Tube "merely threatened once (by email) to cancel all pending

orders with the company" and informed [      ] "by letter, that it would consider whether it

could conduct" business with the company in the future if it did not cooperate.[46]

Garg Tube appealed Commerce's decision to apply partial AFA due to [      ]'s non-

cooperation, arguing that there was "nothing more it could have done" to induce the supplier's

cooperation.  Garg Tube also argued that Commerce erred in determining the missing cost data

and ultimately in calculating Garg Tube's weighted-average dumping margin by using the home

market sale on which it realized the largest loss; instead, Garg Tube argued that Commerce

should have valued the missing supplier costs using Garg Tube's own costs for self-produced

pipe and tube.[47]

### 3. Remand Order

In its *Remand Order*, the CIT recognized that Commerce may in some instances use

adverse inferences when calculating the weighted-average dumping margin for a cooperating

respondent under section 776(a) of the Act.  Specifically, citing *Mueller*, the CIT noted that

Commerce may incorporate adverse inferences against a cooperative respondent under section

776(a) of the Act if doing so will "yield an accurate rate, promote cooperation, and thwart duty

---

[45] *Id.* at 40-41.
[46] *Id.* at 41.
[47] *See Remand Order* at 16-17.

evasion."[48]  The CIT further held that, "{i}f Commerce seeks to induce the cooperation of a non-cooperating supplier through a cooperating party, there must be, for example, substantial evidence that the cooperating party has leverage over the non-cooperating supplier, and that if Commerce is constrained from employing adverse inferences, the non-cooperating party will have an incentive to evade duties by selling merchandise into the United States through the cooperating party."[49]

The CIT determined that, while Commerce cited *Mueller* as controlling judicial precedent in the *Final Results*, it was not reasonably discernable from Commerce's analysis how it was applying partial AFA under section 776 of the Act.  In particular, the CIT found that *Mueller* governs Commerce's incorporation of adverse inferences under section 776(a) of the Act, but the *Final Results* contained language suggesting that Commerce was operating under section 776(b) of the Act to determine the COP for the uncooperative supplier.  For example, Commerce found in the *Final Results* that Garg Tube "did not act to the best of its ability" in attempting to obtain [      ] costs (which, as the CIT observed, tracks language in section 776(b) of the Act).  Because the Court found that it could not discern whether Commerce was "applying {section 776(b) of the Act} against the unaffiliated supplier, against Garg, or whether Commerce here acts pursuant to some other interpretation of {section 776(b) of the Act}," the Court remanded the *Final Results* for further explanation or reconsideration.[50]

In the *Remand Order*, the CIT further held that, "{t}o the extent that Commerce applies {section 776(a) of the Act} against Garg {Tube}, Commerce must do more to support its

---

[48] *Id*. at 18 (citing *Mueller*, 753 F.3d at 1332–36).
[49] *Id*. at 18-19 (citing *Canadian Solar Int'l Ltd. v. United States*, 415 F. Supp. 3d 1326, 1334-35 (CIT 2019) (*Canadian Solar*)).
[50] *Id.* at 19.

determination."[51]  Specifically, the CIT held that Commerce must reconcile its assumption that application of partial AFA "potentially induces the cooperation" of [      ] with detracting evidence indicating that Garg Tube had "insufficient market power" to actually induce such cooperation.[52]  With respect to Garg Tube's documented attempts to induce [        ] cooperation, the CIT observed that Commerce faulted Garg Tube for "merely threatening once" to cancel pending orders while disregarding that "Garg took several actions leading up to the email that Commerce singles out and characterizes as a mere threat to cancel all orders."  The CIT also concluded that the "email itself... appears to be an explicit request to cancel all pending orders" with [      ].[53]

Additionally, the Court assessed that under *Mueller*, Commerce is required to balance policy considerations "against its obligation to calculate an accurate dumping margin for a cooperative party under {section 776(a) of the Act}."  Therefore, the CIT held that if Commerce on remand employs partial AFA to determine the COP for [      ] and to calculate Garg Tube's weighted-average dumping margin under section 776(a) of the Act, it must also "explain how using the acquisition costs for the sale upon which Garg realized its largest loss as a surrogate for missing cost information furthers Commerce's predominant interest in calculating an accurate normal value for Garg's sales of subject merchandise."[54]

Finally, the CIT held that if Commerce alternatively intended to apply section 776(b) of the Act to Garg Tube, Commerce must on remand explain the basis for a determination that Garg Tube is an uncooperative party and support such a determination with substantial evidence.[55]

---

[51] *Id.* at 20.
[52] *Id.*
[53] *Id.* at 20-21.
[54] *Id.* at 21 n.16.
[55] *Id.* at 21-22.

4.  <u>Analysis</u>

In accordance with the Court's *Remand Order*, we reconsidered our reliance on partial AFA when determining the COP for [      ] and calculating Garg Tube's weighted-average dumping margin in the underlying review.[56]  As set forth below, we first clarify that Commerce is not drawing an adverse inference against Garg Tube; that is, Commerce is acting under section 776(a) of the Act.  As to the Court's second finding that Commerce must "do more" to support a determination under section 776(a) of the Act, we have reevaluated the record evidence in view of the Court's *Remand Order*.  Although we respectfully disagree that *Mueller* requires a showing that a respondent actually possesses "market power" or "leverage" over a non-cooperating supplier, we find that we are unable to determine, based on this record, that such "market power" or "leverage" exists.  Therefore, we are no longer relying on partial AFA when calculating Garg Tube's rate under section 776(a) of the Act.  Instead, we are relying on neutral facts available in these final results of redetermination and have determined the COP for [      ] based on the reported acquisition costs for pipe and tube that Garg Tube sourced from this supplier.

Regarding the CIT's finding that it could not reasonably discern how Commerce was applying section 776 of the Act in the *Final Results*, we clarify at the outset that Commerce is not drawing an adverse inference against Garg Tube.  Rather, Commerce finds (consistent with *Mueller*) that [      ] is an interested party within the meaning of section 771(9)(A) of the Act that withheld necessary information (*i.e.*, its actual COP), failed to provide such information within the established deadline, and significantly impeded the review within the meaning of sections

---

[56] Commerce notes that Garg Tube has also challenged the administrative review covering the 2018-19 POR, where Commerce again applied partial AFA when calculating Garg Tube's rate due to supplier non-cooperation. Commerce's determination in that review is based on a distinct factual record.  We clarify that these final remand results apply only to the record before Commerce in the 2017-18 POR.

776(a)(1) and (a)(2)(A)-(C) of the Act.  We also continue to find that [      ] has failed to cooperate to the best of its ability in responding to Commerce's requests for information within the meaning of section 776(b) of the Act.

Due to [      ] non-cooperation, there is a gap in the record with respect to certain of Garg Tube's production costs (*i.e.*, Commerce must rely on section 776(a) of the Act to determine these missing data and to calculate Garg Tube's weighted-average dumping margin). The statute authorizes Commerce, in place of missing COP data needed to determine Garg Tube's weighted-average dumping margin, to consider an adverse inference against non-cooperative suppliers such as [      ] when selecting from among the facts otherwise available under section 776(a) of the Act.[57]  That is, notwithstanding Garg Tube's own cooperation, Commerce may rely on policy rationales of deterrence and evasion to calculate Garg Tube's weighted-average dumping margin "as long as the application of those policies is reasonable on the particular facts and the predominant interest in accuracy is properly taken into account."[58]  In sum, though we appreciate that Commerce's *Final Results* were potentially unclear in this respect, we now clarify that we are *not* treating Garg Tube as an uncooperative respondent for purposes of this redetermination.

Because Commerce is acting under section 776(a) of the Act to determine the missing COP information for [      ], we next consider the Court's holding that Commerce must "do more to support its determination" that the policy considerations in *Mueller* (*e.g.*, of deterring non-cooperation and thwarting duty evasion) justify relying on partial AFA.  In this respect, we acknowledge the CIT's finding that Commerce must identify "substantial evidence that the cooperating party has leverage over the non-cooperating supplier" to properly invoke adverse

---

[57] *See Mueller*, 753 F.3d at 1233-1234.
[58] *Id.* at 1233.

inferences under section 776(a) of the Act and *Mueller*.[59]  We also note that the CIT cites its

prior opinion in *Canadian Solar* in support of this finding, and that the CIT determined that

evidence of the mandatory respondent's strong market presence, significant growth, and

maintenance of supplier-specific accounts did not "reasonably indicate the presence of a long-

term relationship creating leverage."[60]  In *Canadian Solar*, the CIT also held that the "potential"

to induce a supplier's cooperation did not provide a compelling policy basis to rely on partial

AFA in calculating the cooperating respondent's weighted-average dumping margin under

section 776(a) of the Act.[61]

      We reviewed the record evidence in light of the standard articulated by the CIT in its

*Remand Order* and find that we are unable to identify substantial record evidence to support a

determination that Garg Tube possessed market power or leverage over [    ].  As the CIT

highlights in the *Remand Order*, Garg Tube attempted on several occasions to secure [     ]

cooperation and produced emails requesting the cancellation of all pending orders and

threatening to sever business ties entirely in the future.  Notwithstanding these efforts, [    ]

declined to cooperate with Commerce in this review based on its assessment that the costs of

complying "far outweigh any possible benefit to our business …"[62]  Therefore, we are unable to

demonstrate that Garg Tube possessed leverage over [    ] given that Garg Tube was not able to

successfully induce [    ] cooperation despite multiple attempts to do so and despite

threatening to sever business ties with the supplier.

      While Commerce has made this determination based on the record of this review and the

---

[59] *See Remand Opinion* at 18.
[60] *See Canadian Solar*, 415 F. Supp. 3d at 1334-35.
[61] *Id.* at 1334.
[62] *See* Garg Tube's Letter, "Welded Carbon Steel Standard Pipes and Tubes from India:
Garg Tube Export LLP ("GTEL") & Garg Tube Limited ("GTL") Response to Section A-D Supplemental
Questionnaire," dated February 19, 2019 (GT's 1st SQR) at 52 and Exhibit S1-D-2(d) (containing's [    ] letter
identified in Email R-13).

CIT's conclusions in the *Remand Order*, we are troubled by the implications of the Court's opinion.  When a respondent's supplier fails to cooperate with Commerce's request for information, it may be difficult for Commerce to identify substantial evidence of the respondent's "market power" or "leverage" over the supplier.  This is because the information necessary for such a determination will be in the possession of the non-cooperating supplier.  For instance, in the review at issue here, Garg Tube provided [        ] financial statements.[63]  Garg Tube argued that these financial statements demonstrate that it did not exert market power over [        ] because [        ] revenues [

                                    ].  But these financial statements do not describe in any detail [        ] business strategy for the United States market with respect to subject pipe and tube, or whether [        ] has any kind of strategic partnership with Garg Tube.  Additionally, while [        ] financial statements do not segregate revenue by specific products or markets, they do indicate that: (1) India is [        ] primary market; and (2) Garg Tube's share of [        ] domestic revenue is [               ] (even assuming, conservatively, that [        ] sales in the domestic market of black and galvanized pipe and tube are all of merchandise under consideration).  As demonstrated below, this limited evidence indicates that Garg Tube is [

                                    ], accounting for nearly [      ] percent of [        ] domestic sales, the bulk of which is resold in the U.S. market through Garg Tube:

---

[63] *See* GT's 1st SQR at Exhibit S1-D-2(f) Part-1.

|  | [          ] (2017-18 FS) |  |
|---|---|---|
| Total Revenue* | [ | ] lakhs |
| Total Revenue* | [ | ] rupees |
| Revenue (Sales of Finished Goods Within India)* | [ | ] lakhs |
| Revenue (Sales of Finished Goods Within India)* | [ | ] rupees |
| Share MS and GI Pipe and Tube of Total Revenue* | [ | ] |
| Revenue (Sales of Finished Goods Within India) - MS and GI Pipe and Tube | [ | ] rupees |
| GT's POR Purchases of [        ] MS and GI Pipe and Tube** | [ | ] rupees |
| GT's Share of [          ] Domestic Sales | [ | ] |
| *Exhibit S1-D-2 (f) Part-1 | | |
| **Exhibit A-14 | | |

Notwithstanding this evidence, because [      ] did not cooperate in this review,
Commerce could not obtain complete information that would be needed to fully assess Garg
Tube's ability to induce [      ] cooperation (or [      ] possible motives in declining to
provide the requested COP information).  Moreover, as this is the first review where Commerce
individually examined Garg Tube, we do not have the privilege of time in accumulating evidence
of a "long-term" relationship between Garg Tube and [      ] that potentially gives rise to
leverage.[64]  As such, we are limited in the conclusions that we can draw from the available
record evidence precisely because of the supplier's non-cooperation.

Although, as described above, we are not relying on partial AFA to determine the costs of
production for the non-cooperating supplier under section 776(a) of the Act, we nonetheless
briefly address the CIT's concern that Commerce's gap-filling in the *Final Results* did not yield
an "accurate" normal value for Garg Tube's sales of subject merchandise produced by [      ].
As an initial matter, in *Mueller*, the Federal Circuit did not define what makes a result "accurate"
and the Federal Circuit has since clarified that a weighted-average dumping margin is "'accurate'
if it is correct as a mathematical and factual matter" and comports with the relevant legal

---

[64] *See Canadian Solar*, 415 F. Supp. 3d at 1334 (indicating that evidence of a "a long-term relationship" may help
establish leverage).

framework.[65]  Garg Tube has not alleged that the weighted-average dumping margin calculated for it is inaccurate under this articulation and there is no evidence on the record to support such a conclusion.

Moreover, in *Mueller*, the Federal Circuit found that accuracy concerns must be balanced against relevant policy considerations (including a concern that "calculating too low a rate" might facilitate duty evasion or incentivize future non-cooperation).[66]  When viewed through this lens, the normal values calculated for Garg Tube in the *Final Results* were accurate because the use of facts available was "precisely proportional to the missing cost information" and relied on Garg Tube's own data submitted on the record of the review.[67]  In other words, the application of partial AFA was specifically confined to filling the gap caused by the missing COP information and in all other respects relied on Garg Tube's data as submitted.  Additionally, the evidence relied upon to fill the gap was based on Garg Tube's own costs for the home market sale on which it realized the largest loss.  While this sale may not reflect Garg Tube's typical loss margin, it is nonetheless an actual transaction during the POR and is "accurate" in that [    ] of Garg Tube's [    ] home market sales (or [   ] percent) during the POR were below cost, *i.e.*, at a loss, even after negating a PMS adjustment to COP for purposes of the sales-below-cost test.[68]  In any event, the CIT need not reach this "accuracy" question because Commerce is no longer relying on partial AFA in calculating Garg Tube's rate under section 776(a) of the Act.

## III.    COMMENTS ON DRAFT REMAND REDETERMINATION

On September 9, 2021, Commerce issued its Draft Remand Redetermination and

---

[65] *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016).
[66] *See Mueller*, 753 F.3d at 1235-36.
[67] *See Final Results* IDM at 39.
[68] *See* Garg Tube's Draft Redetermination Calculation Memorandum at 37 and 96.

provided interested parties an opportunity to comment on it.[69]  Commerce received comments

from Garg Tube[70] and Nucor Tubular Products Inc. (Nucor), the domestic interested party.[71]

These comments are addressed below.  After considering Garg Tube's and Nucor's comments,

we made no changes to our conclusions in the Draft Remand Redetermination for these final

results of redetermination.

***Particular Market Situation***

*Garg Tube's Comments*

- Garg Tube supports Commerce's decision in the Draft Remand Redetermination to
  remove the PMS adjustment to Garg Tube's COP for purposes of the sale-below-cost
  test.  This redetermination complies with CIT instruction invalidating Commerce's PMS
  application, as well as extensive and unanimous CIT precedent.[72]

- Garg Tube opposes Commerce's Draft Remand Redetermination that continues to apply
  a PMS adjustment when calculating the COP where normal value is based on
  constructed value (CV).  Such an adjustment follows Commerce's continued PMS
  finding, which is unsupported by the requisite substantial evidence, as Garg Tube
  detailed in its CIT briefs.[73]

*Nucor's Comments*

---

[69] *See* "Draft Results of Redetermination Pursuant to Court Order, *Garg Tube Export LLP and Garg Tube Limited v. United States*, Court No. 20-00026, Slip Op. 21-83 (CIT July 9, 2021)," dated September 9, 2021 (Draft Remand Redetermination).
[70] *See* Garg Tube's Letter, "Comments on Draft Remand:  Antidumping Duty Order on Welded Carbon Steel Standard Pipes and Tubes from India," dated September 17, 2021 (Garg Tube's Comments on Draft Results of Redetermination).
[71] *See* Nucor's Letter, "Welded Carbon Steel Standard Pipes and Tubes from India:  Comments on Draft Results of Redetermination," dated September 17, 2021 (Nucor's Comments on Draft Results of Redetermination).
[72] *See* Garg Tube's Comments on Draft Results of Redetermination at 2.
[73] *Id*. at 2-3 and Exhibits 1 and 2.

- For the reasons set forth in Defendant-Intervenors' response brief before the CIT, Nucor respectfully disagrees with the Court that the statute does not permit Commerce to adjust the COP to account for a PMS when performing the sales-below-costs test. However, given the Court's opinion and remand order, Commerce is left with no choice but to no longer apply the PMS adjustment in the sales-below-cost text context.[74]

- Nucor agrees with Commerce's decision in the Draft Remand Redetermination to remove the PMS adjustment to reported costs in the sales-below-cost context, under respectful protest.[75]

- Nucor urges Commerce to continue to apply a PMS adjustment for the purposes of the sales-below-cost test in future proceedings, as this issue is on appeal currently before the U.S. Court of Appeals for the Federal Circuit (CAFC).[76]

- Nucor supports Commerce's continued application of the PMS adjustment when calculating NV based on CV – in the *Remand Order*, "the court distinguished between the CV and normal value sections of the statue and, thus, it is entirely appropriate for Commerce to continue to apply PMS in the CV context."[77]

- Nucor supports Commerce's continued finding that a PMS existed in India that distorted the price of hot-rolled coil.  As Commerce noted in the Draft Remand Redetermination, this finding was beyond the scope of the *Remand Order* and, thus, Nucor urges Commerce not to consider arguments made concerning the existence of the PMS in India.[78]

---

[74] *See* Nucor's Comments on Draft Results of Redetermination at 3-6.
[75] *Id*. at 6.
[76] *Id*.
[77] *Id*. at 6 (citing *Remand Order* at 14-16).
[78] *Id*. at 6-7.

**Commerce's Position:**  Commerce found that a cost-based PMS existed during the POR, which distorted the cost of hot-rolled coil used in the production of the merchandise in India, in the 2017-2018 antidumping duty administrative review of pipe and tube from India.[79]  The CIT found that Commerce is not permitted under the statute from adjusting a respondent's COP to account for a cost-based PMS when relying on home market sales prices to determine normal value.[80]  Commerce, under respectful protest, removed the PMS adjustment to Garg Tube's COP for purposes of the sales-below-cost test.  Because Commerce, in accordance with the CIT's *Remand Order*, is thus limited in only applying the PMS adjustment to COP when normal value is based on CV, Commerce is unable on remand to provide a full remedy to address the cost-based PMS found in this administrative review.[81]

As Commerce noted in the Draft Remand Redetermination, the CIT declined to reach Garg Tube's arguments regarding whether Commerce's PMS finding and resulting PMS adjustment were supported by substantial evidence.[82]  As such, Commerce's finding that a PMS existed in India during the POR that distorted the price of hot-rolled coil is an issue beyond the scope of the *Remand Order*.  Therefore, we find inapposite Garg Tube's opposition to Commerce's determination that a PMS existed during the POR.

In the Draft Remand Redetermination, we stated that, while CV is normally calculated using the respondent's reported cost of manufacturing, where Commerce finds that a PMS existed in the home market that distorts the COP, Commerce may use any reasonable methodology to adjust for this PMS when determining the cost of manufacture of the subject

---

[79] *See Final Results* and IDM.
[80] *See Remand Order* at 14-16.
[81] *See* Draft Results of Redetermination at 8.
[82] *See Remand Order* at 16.

merchandise.[83]  Further, as we stated in the Draft Remand Redetermination, because the CIT

agreed that this is an appropriate adjustment under section 773(e) of the Act (but not under

section 773(b)(1) of the Act), in the final result of redetermination we applied a PMS adjustment

when calculating cost of manufacture where normal value is based on CV.[84]

 **AFA for Non-Cooperating Supplier**

*Garg Tube's Comments*

- Garg Tube supports Commerce's Draft Remand Redetermination that recalculates Garg
  Tube's weighted-average dumping margin by relying on neutral facts available to fill the
  gap in the COP data caused by a certain supplier's non-cooperation.  Commerce's
  redetermination complies with CIT instruction concerning Commerce's s application of
  partial AFA.[85]

*Nucor's Comments*

- Consistent with the *Mueller* framework, the *Remand Order*, and the facts on the record
  of this proceeding, Commerce should reinstate its partial AFA determination regarding
  missing cost information from Garg Tube's unaffiliated supplier, [      ], in the final
  results.[86]

  - As the CIT discussed in its *Remand Order*, the CAFC found in *Mueller* that
    Commerce is permitted to rely on AFA for missing input supplier cost
    information if it appropriately balances its policy considerations of deterrence

---

[83] *See* Draft Results of Redetermination at 10.
[84] *Id.* at 9-10; *see also Remand Order* at 14.
[85] *See* Garg Tube's Comments on Draft Results of Redetermination at 2.
[86] *See* Nucor's Comments on Draft Results of Redetermination at 7-8.

and duty evasion against a primary interest in achieving an accurate weighted-average dumping margin. [87]

o The *Mueller* standard specifically envisions that AFA may be appropriate where a respondent maintains sufficient market power to induce cooperation from their input suppliers.[88]

o In effect, *Mueller* requires that accuracy, deterrence, and evasion concerns be factored into Commerce's application of facts available under section 776(a) of the Act.[89]

o In deciding to not apply AFA in its Draft Remand Redetermination, Commerce (1) ignores the interest in an accurate weighted-average dumping margin that would be served by continuing to adjust costs by applying AFA under the methodology used in its final results, and (2) overlooks record evidence showing that Garg Tube did maintain significant market power over [      ] such that it should have been able to induce [       ] cooperation.[90]

o In its final results of redetermination, Commerce should continue to use partial AFA with respect to the missing cost information from [      ] under either one or both of the following bases: (1) applying partial AFA to ensure accurate margin calculations in a market distorted by the PMS; (2) applying partial AFA due to clear evidence that Garg Tube maintains substantial market power over [      ].[91]

---

[87] *Id*. at 8.
[88] *Id*.
[89] *Id*.
[90] *Id*. at 9.
[91] *Id*. at 9-12.

- Unlike in the administrative proceeding underlying *Mueller*, here, Commerce found the Indian hot-rolled coil market to be distorted due to the existence of a PMS in India, requiring an adjustment.  Given the PMS distorting the Indian steel market, without a partial AFA adjustment, the use of reported acquisition costs may not be an accurate approximation of the supplier's actual costs of production and, consequently, would result in an inaccurate margin calculation.[92]

- In essence, the existence of the PMS in India requires an adjustment to ensure the accuracy required by *Mueller* and distinguishes this review from other determinations resolved under the *Mueller* framework.[93]

- In its Draft Remand Redetermination, Commerce does not place enough weight on the fact that Garg Tube was [

   ].  Thus, if an Indian pipe supplier wanted [

   ] – this is the epitome of market power.[94]

- Commerce will never have complete information concerning the business arrangements and relationships between respondent companies and their input suppliers in these scenarios, in part because the input suppliers have already demonstrated their unwillingness to cooperate.  Thus, Commerce need not interrogate whether threats made, or other actions taken, were

---

[92] *Id*. at 9-10.
[93] *Id*. at 10.
[94] *Id*. at 10-11.

sufficient to induce cooperation.  Rather, as is the review in this proceeding, Garg Tube maintains significant market power and it failed to induce cooperation from its input suppliers.  Accordingly, the application of partial AFA is warranted based on the deterrence policy rationale articulated in *Mueller*.[95]

- In sum, in the interests of accurate margin calculations and in inducing future cooperation, in the final results of redetermination Commerce should revise its Draft Remand Redetermination to (1) re-instate the application of partial AFA regarding [        ] missing cost information, and (2) apply the AFA rate of [      ] percent (used in the *Final Results*) to the unaffiliated suppliers' missing costs, which was derived in the *Final Results* on the basis of costs inclusive of the PMS adjustment, instead of the AFA rate of [      ] percent used in the Draft Remand Redetermination, which was derived there exclusive of the PMS adjustment.[96]

**Commerce's Position:**  In its *Remand Order*, the CIT held that, under the *Mueller* framework, "{i}f Commerce seeks to induce the cooperation of a non-cooperating supplier through a cooperating party, there must be, for example, substantial evidence that the cooperating party has leverage over the non-cooperating supplier, and that if Commerce is constrained from employing adverse inferences, the non-cooperating party will have an incentive to evade duties by selling merchandise into the United States through the cooperating party."[97]  Further, the CIT held that Commerce must reconcile its assumption that application of partial AFA "potentially induces the

---

[95] *Id*. at 12.
[96] *Id*. at 13-15.
[97] *See Remand Order* at 18-19.

cooperation" of [      ] with detracting evidence indicating that Garg Tube had "insufficient

market power" to actually induce such cooperation.[98]  In the Draft Remand Redetermination, in

addressing the CIT's finding that Commerce must "do more" to support a determination under

section 776(a) of the Act, we have reevaluated the record evidence in view of the Court's

*Remand Order*.  Expressing our disagreement that *Mueller* requires a showing that a respondent

actually possesses "market power" or "leverage" over a non-cooperating supplier, we found that

we are unable to determine, based on this record, that such "market power" or "leverage"

existed.  Specifically, we acknowledged the CIT's finding that Commerce must identify

"substantial evidence that the cooperating party has leverage over the non-cooperating supplier,

and that if Commerce is constrained from employing adverse inferences, the non-cooperating

party will have an incentive to evade duties by selling merchandise into the United States

through the cooperating party," to properly invoke adverse inferences under section 776(a) of the

Act and *Mueller*.[99]  In support of its finding in the *Remand Order*, we also noted the CIT's

reliance on *Canadian Solar*,[100] where the CIT (1) deemed, among other factors, evidence of the

respondent's strong market presence insufficient to reasonably infer the presence of a long-term

relationship that creates leverage, and (2) found that the "potential" to induce a supplier's

cooperation did not provide a compelling policy basis to rely on partial AFA in calculating the

cooperating respondent's weighted-average dumping margin under section 776(a) of the Act.  In

light of the standards articulated by the CIT in its *Remand Order*, we determined that we are

unable to identify substantial record evidence to support a determination that Garg Tube

possessed market power or leverage over [      ].  Specifically, notwithstanding Garg Tube's

---

[98] *Id*. at 20.
[99] *See Remand Order* at 18-19.
[100] *Id.* at 19.

extensive efforts to secure [        ] cooperation and threats to sever future business ties, [        ] declined to cooperate with Commerce in this review.  Under the standards articulated by the CIT in its *Remand Order*, such facts do not support a dispositive demonstration of Garg Tube possessing leverage over the supplier that's necessary to induce its cooperation.

We are not persuaded by Nucor's argument that Garg Tube maintains substantial market power over [        ].  Nucor argues that, because Garg Tube was [

].[101]  Nucor has not addressed the record evidence provided by Garg Tube in this review that its unaffiliated suppliers did not have knowledge of the ultimate destination of pipe and tube that they sold to Garg Tube.[102]  On the basis of this information, Commerce found in the *Preliminary Results* (unchanged in the *Final Results*) that Garg Tube is the first party in the transaction chain with knowledge of the U.S. destination of the pipe and tube, and, thus, has treated sales of the pipe and tube, both in the Indian and U.S. markets, produced by Garg Tube's unaffiliated suppliers, as sales attributable to Garg Tube.[103] Accordingly, the information provided by Garg Tube indicates that [        ] is not aware that the merchandise it sells to Garg Tube is destined for the U.S. market.  Further, Nucor does not explain why [        ] is unable to export subject merchandise to the United States itself, [

].  Moreover, and of importance here, concerning one policy consideration envisioned in *Mueller*, *i.e.*, thwarting duty evasion, Nucor does not address how [        ], the non-cooperating party in this review, would have an incentive

---

[101] *See* Nucor's Comments on Draft Results of Redetermination at 11.
[102] *See Welded Carbon Steel Standard Pipes and Tubes from India:  Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 33916 (July 16, 2019) (Preliminary Results), and accompanying Decision Memorandum at 16.
[103] *Id.*

to evade duties ([                                                                                      ].  In

*Mueller*, the Court reasoned that Ternium (an unaffiliated and uncooperative supplier) could

evade its own company-specific, AFA-based antidumping duty rate by exporting its goods

through Mueller (respondent) if Mueller were assigned a more favorable antidumping duty

rate.[104]  Here, unlike the factual scenario in *Mueller*, [      ] does not export subject merchandise

directly to the United States.[105]  [      ] was never a mandatory respondent in a segment of this

proceeding and does not have its own, company-specific antidumping duty rate.  Thus, there is

no evidence that [      ] would have a natural incentive to evade duties by [

                                                                    ], if Commerce were constrained from

employing adverse inferences against Garg Tube.[106]

Commerce disagrees with Nucor's attempt to distinguish the present review from *Mueller*

by arguing that the PMS determination requires the application of partial AFA to accurately

reflect Garg Tube's acquisition costs.  This argument seems to conflate the factors Commerce

considers in its PMS analysis and its AFA analysis, in a way that Commerce did not contemplate

or address in the underlying review and was not argued before the Court.

Finally, Commerce disagrees with Nucor that it is appropriate to apply the AFA rate of

[      ] percent (used in the *Final Results*) to the missing costs of another unaffiliated supplier,

([      ]).  In the *Final Results*, the AFA rate was, in fact, derived on the basis of costs inclusive

of the PMS adjustment to hot-rolled coil costs,[107] but was then applied to the costs of both

unaffiliated and uncooperative suppliers, [                      ], exclusive of the PMS adjustment to

---

[104] *See Mueller*, 753 F.3d at 1232.
[105] *See* Garg Tube's Letter, "Welded Carbon Steel Standard Pipes and Tubes from India:  Email Communication
with Un-affiliated Supplier Relating to Cost of Production Requested by Department," dated May 20, 2019 at
Exhibit 3.
[106] *See Canadian Solar*, 415 F. Supp. 3d at 1334-35.
[107] *See* Final Analysis Memorandum at 6.

hot-rolled coil,[108] in order to avoid double counting.[109]  Conversely, but with the same intent of avoiding double counting, and in keeping with the *Remand Order*, in the Draft Remand Redetermination, the AFA rate was derived exclusive of the PMS adjustment to hot-rolled coil costs[110] but was then applied to the costs of [      ] inclusive of the PMS adjustment to hot-rolled coil.[111]  Accordingly, in these final results of redetermination, Commerce continues to calculate an AFA rate of [    ] percent and apply it to the missing costs from [        ].

## IV.    FINAL RESULTS OF REMAND REDETERMINATION

Pursuant to the Court's *Remand Order*, Commerce recalculated Garg Tube's weighted-average dumping margin by (1) reversing a PMS adjustment to Garg Tube's COP for purposes of the sales-below-cost test and (2) relying on neutral facts available to fill the gap in the COP data caused by the supplier's non-cooperation.  Accordingly, the revised weighted-average dumping margin for Garg Tube is as follows:

| Exporter or Producer | Final Results of Review<br><br>Weighted-Average Dumping Margin[112] | Final Results of Redetermination<br><br>Weighted-Average Dumping Margin[113] |
|---|---|---|
| Garg Tube Export LLP and Garg Tube Limited | 11.83 | 1.73 |

---

[108] *Id.*

[109] *See Final Results* IDM at Comment 3.

[110] The methodology underpinning Commerce's derivation of the partial AFA rate involves ascertaining a home market sale on which Garg Tube realized the largest loss, which is predicated on the execution of the sales-below-cost test and its results.  Because the CIT held in the *Remand Order* that Commerce is not authorized under the statute to make a PMS adjustment to a respondent's COP for purposes of determining which of its home market sales were made below cost, unlike in the *Final Results,* Commerce's derivation of the partial AFA rate in its Draft Results of Redetermination was based on costs unadjusted for PMS prior to the execution of the sales-below-cost test, and a subsequent identification of the largest-loss home market sale.

[111] *See* Draft Redetermination Calculation Memorandum at 22 (for lines 7483-7503 of the AFA Rate Derivation program log) and 151-152 (for lines 7674-7689, 7715-7718 of the margin calculation program log).

[112] *See Final Results*, 85 FR at 2716.

[113] *See* Draft Redetermination Calculation Memorandum.

10/1/2021

X _____

Signed by: CHRISTIAN MARSH

_____

Christian Marsh
Acting Assistant Secretary
 for Enforcement and Compliance