A-533-502<br>
Remand<br>
Slip Op. 22-18<br>
POR: 05/01/17 – 04/30/18<br>
**Public Document**<br>
E&C/OI: DV

*Garg Tube Export LLP and Garg Tube Limited v. United States*
Court No. 20-00026, Slip Op. 22-18 (CIT March 11, 2022)
Welded Carbon Steel Standard Pipes and Tubes from India

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

**I.   SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand order of the United States Court of International Trade (CIT or Court) in *Garg Tube Export LLP and Garg Tube Limited v. United States*, Court No. 20-00026, Slip Op. 22-18 (CIT March 11, 2022) (*Remand Order*).  These final results of redetermination concern the 2017-2018 antidumping duty administrative review of welded carbon steel standard pipes and tubes (pipe and tube) from India.[1]  The respondents in the administrative review, and the plaintiffs in this litigation, are Garg Tube Export LLP and Garg Tube Limited (collectively, Garg Tube).

The *Remand Order* follows the Court's prior remand order in *Garg Tube I* concerning the underlying review and our First Redetermination.[2]  In *Garg Tube I*, the Court held that Commerce is not authorized under the statute to make a particular market situation (PMS) adjustment to a respondent's cost-of-production (COP) for purposes of determining which of its

---

[1] *See Welded Carbon Steel Standard Pipes and Tubes from India:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 2715 (January 16, 2020) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Garg Tube Export LLP v. United States*, 527 F. Supp. 3d 1362 (CIT 2021) (*Garg Tube I*); *see also* "Final Results of Redetermination Pursuant to Remand," Court No. 20-00026, Slip Op. 21-83 (CIT October 7, 2021) (First Redetermination), available at https://access.trade.gov/Resources/remands/21-83.pdf.

home market sales were made below cost.[3]  Also, the Court held in *Garg Tube I* that it was not reasonably discernable from Commerce's analysis in the *Final Results* how it was applying partial adverse facts available (AFA) under section 776 of the Tariff Act of 1930, as amended (the Act) to address the non-cooperation of one of Garg Tube's suppliers.[4]  The CIT further held in *Garg Tube I* that to the extent Commerce determined the missing COP data for the unaffiliated suppliers under section 776(a) of the Act, Commerce needed to "do more to support its determination."[5]  On this basis, the CIT remanded Commerce's application of partial AFA and PMS adjustment in the sales-below-cost test in Garg Tube's margin calculations for further explanation or reconsideration.

In the First Redetermination, Commerce continued to find that a PMS existed in India during the period of review (POR) that distorted the price of hot-rolled coil, the principal material input for the production of the subject merchandise and a significant component of the COP of the subject merchandise.[6]  In accordance with *Garg Tube I*, we recalculated Garg Tube's weighted-average dumping margin with no PMS adjustment to Garg Tube's COP for purposes of the sales-below-cost test, but continued to apply a PMS adjustment when calculating the COP where normal value is based on constructed value, in accordance with section 773(e) of the Act.[7]  With respect to the issue of Garg Tube's unaffiliated, non-cooperative supplier, in the First Redetermination, Commerce, under respectful protest, modified its calculations for Garg Tube

---

[3] *See Garg Tube I*, 527 F. Supp. 3d at 1370.  Because the Court found that Commerce's PMS adjustment was improper under the statute, it did not rule on whether Commerce's PMS finding, and corresponding cost adjustment were supported by substantial evidence.  *Id.*, 527 F. Supp. 3d at 1371.
[4] *Id.*, 527 F. Supp. 3d at 1371–73.
[5] *Id.*, 527 F. Supp. 3d at 1372.
[6] *See* First Redetermination at 3, 8-10.
[7] *Id.*

2

by relying on neutral facts available to fill the gap in the COP data caused by the supplier's non-cooperation.[8]

In the *Remand Order*, the Court sustained (1) Commerce's redetermination on remand to rely on neutral facts available to fill the gap created by the missing COP data from Garg Tube's unaffiliated supplier;[9] and (2) Commerce's redetermination on remand to remove the PMS adjustment to Garg Tube's COP for purposes of the sales-below-cost test.[10]  However, the Court has now remanded Commerce's finding that a PMS existed during the period of review, and corresponding adjustment to COP when determining NV on the basis of CV for further explanation or reconsideration.  In particular, while the Court found that Commerce supported "with substantial evidence its determination that a variety of factors exist in the Indian market that affect the price of {hot-rolled coil},"[11] the Court remanded other aspects of Commerce's analysis.  Specifically, the Court found that "Commerce fails to explain how the cumulative and collective impact of the market phenomena upon which it relies are unique to the Indian market and therefore constitute a PMS."[12]  The Court further found that Commerce failed to explain how "the alleged PMS distorts the cost of production so that {Garg Tube's} reported costs of production are not accurate in the ordinary course of trade."[13]  Further, the Court found that Commerce's decision to quantify a PMS adjustment using an ordinary least squares (OLS) regression model was reasonable, as was Commerce's reliance on the regression coefficient for uneconomic capacity.[14]  However, the Court remanded, for reconsideration or further

---

[8] *Id*. at 3, 17-22.
[9] *See Remand Order* at 8-10
[10] *Id*. at 11.
[11] *Id.* at 16-20.
[12] *Id*. at 20-21.
[13] *Id*. at 21.
[14] *Id*. at 25-26.

explanation, Commerce's application of its selected methodology via the OLS regression model, finding that Commerce did not adequately address record evidence detracting from the validity of the model.[15]

While we respectfully disagree that Commerce has not shown that a PMS existed during the POR such that Garg Tube's costs for purposes of constructed value "are not accurate in the ordinary course of trade," we reconsidered our analysis considering the *Remand Order*. Thus, in these final results of redetermination, and under respectful protest, Commerce is no longer finding that a PMS existed in India during the POR with respect to the price of hot-rolled coil. Additionally, because we are no longer finding that a PMS existed with respect to the price of hot-rolled coil, the remanded issues concerning Commerce's calculation of the PMS adjustment are moot.

## II.     FINAL RESULTS OF REDETERMINATION

*Legal Framework*

Section 504 of the Trade Preferences Extension Act of 2015 (TPEA) added the concept of PMS in the definition of the term "ordinary course of trade," and for purposes of constructed value under section 773(e) of the Act.[16] Section 773(e) of the Act states that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology." Although the Act does not define "particular market situation," the Statement of Administrative Action (SAA) explains that examples where such a situation may

---

[15] *Id*. at 27.
[16] *See Trade Preferences Extension Act of 2015*, Pub. L. No. 114-27, 129 Stat. 362 (2015) (TPEA).

exist include "where there is government control over pricing to such an extent that home market prices cannot be considered competitively set."[17]

Section 504 of the TPEA also amended the Act to provide Commerce with additional discretion when applying the PMS concept to determine normal value.[18] Specifically, in section 504 of the TPEA, Congress added the PMS concept to sales and transactions that Commerce will consider outside the "ordinary course of trade," and thus not usable in its antidumping calculations. Under section 771(15) of the Act, Commerce shall find "sales and transactions" to be "outside the ordinary course of trade" in situations in which it "determines that the particular market situation prevents a proper comparison with the export price or constructed export price."[19]

Further, section 504 of the TPEA amended the constructed value provision in section 773(e) of the Act by permitting Commerce to use alternative cost calculation methodologies upon a particular market situation finding. Under section 773(e) of the Act, when Commerce, in calculating constructed value, finds that a "particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade," Commerce "may use another calculation methodology under this part or any other calculation methodology."

*Particular Market Situation*

1. Background

In the *Final Results*, Commerce found the existence of a PMS in India that distorted the prices of hot-rolled coil in the Indian market based on the collective impact of the continued

---

[17] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol 1 (1994) at 822.
[18] *See* TPEA.
[19] *Id*.

5

effects of global steel overcapacity, the Government of India (GOI)'s subsidization of hot-rolled coil, the GOI's findings that imports are unfairly traded, and the non-payment of antidumping or safeguard duties on imports of hot-rolled coil.[20]  Accordingly, Commerce accounted for this distortion by making an upward adjustment to Garg Tube's reported cost of hot-rolled coil, an input used to produce pipe and tube, for purposes of determining the normal value of Garg Tube's sales of pipe and tube.[21]

In reaching this determination, Commerce disagreed with Garg Tube's argument that global steel overcapacity impacted all markets and thus was not "unique to India." In particular, Commerce explained that "global overcapacity will manifest its distortive effects differently in different markets."[22]  To that end, Commerce found that the GOI addressed overcapacity by "actively pursu{ing} measures, such as subsidization and trade remedies, all aimed at supporting the domestic steel producers and their ambitions for capacity expansions."[23]  Moreover, Commerce found that Garg Tube was exempt under Indian law from paying remedial duties such that the measures enacted to combat the effects of overcapacity were "not effectuated in the COP of pipe and tube produced in India."[24]  Commerce also disagreed that a PMS finding must be "uniquely confined to a single country" and explained that its selected PMS adjustment (based

---

[20] *See Final Results* IDM at Comment 1.
[21] *Id.* at Comment 7.
[22] *Id.* at Comment 1.
[23] *Id.*
[24] *Id.*; *see also* Memorandum, "2017-2018 Administrative Review of Antidumping Duty Order on Welded Carbon Steel Standard Pipes and Tubes from India:  Decisions on Particular Market Situation Allegations," dated July 10, 2019 (PMS Memo), at 25-26.

on the specific regression methodology used) "isolate{d} the specific effects of the global steel overcapacity crisis on the Indian {hot-rolled coil} market during the POR."[25]

Commerce further found that the PMS distorted hot-rolled coil prices in India. In this regard, Commerce noted that the distortive price effects of global steel overcapacity were "well-chronicled" and that they continued to exist in India during the POR.[26] Commerce found that the very existence of safeguard and antidumping duties on hot-rolled coil imports "confirms that the GOI recognizes the adverse price effects that imports are having on domestic HRC prices and, thus, the distortive effects these imports have in the market."[27] That Garg Tube was exempt from paying such duties – which were "intended to combat the prices of unfairly traded HRC imported into the Indian market"[28] – further informed Commerce's determination that the PMS distorted hot-rolled coil costs during the POR. Additionally, Commerce found that the GOI's subsidization of hot-rolled coil producers "allowed the domestic HRC producers to remain competitive in the face of suppressed HRC import prices."[29] As such, the subsidies "exerted downward pressures on HRC prices in India in connection with transactions involving consumers of HRC (*i.e.*, producers of pipe and tube, such as Garg Tube.)"[30] In evaluating price distortion, Commerce disagreed with Garg Tube that it was required under the statute to determine "whether a respondent's specific purchase prices of HRC were distorted and, thus, outside of the ordinary course of trade."[31] Commerce also found that it would be meaningless to

---

[25] *See Final Results* IDM at Comment 1.
[26] *See, e.g.*, PMS Memo at 20.
[27] *Id.* at 22.
[28] *Id.* at 22.
[29] *See Final Results* IDM at 29.
[30] *Id.* at 29-30.
[31] *Id.* at 29.

7

compare hot-rolled coil prices in India to global benchmark prices absent evidence that the benchmark prices "were insulated from the effects of the global steel overcapacity crisis."[32]

When determining the normal value of Garg Tube's U.S. sales of pipe and tube, Commerce relied on: (1) home market prices after applying the sales-below-cost test which included a PMS adjustment to Garg Tube's reported costs of production; or (2) constructed value which included a PMS adjustment to Garg Tube's reported costs of production.[33] Commerce quantified the impact of the PMS by the adjustment factor derived from a regression analysis placed on the record by the domestic interested parties.[34]

As a result of the CIT's decision in *Garg Tube I*, Commerce did not make a PMS adjustment to Garg Tube's COP for purposes of the sales-below-cost test but continued to apply a PMS adjustment when calculating COP where normal value was based on constructed value, in accordance with section 773(e) of the Act.

2. Remand Order

In the *Remand Order*, relying on the language in sections 773(e) and 773(f)(1) of the Act, the CIT held that "{a} finding of a PMS in the constructed value context requires Commerce to identify what unique fact or set of facts in the market prevents a respondent's reported 'cost of materials and fabrication or other processing' from 'accurately reflecting the cost of production in the ordinary course of trade.'"[35] The CIT found that where, as here, Commerce relies on the "cumulative and collective impact of multiple market phenomena" to support a PMS

---

[32] *Id.* at 26.
[33] *See* Memorandum, "Administrative Review of the Antidumping Duty Order on Welded Carbon Steel Standard Pipes and Tubes from India: Final Analysis Memorandum for Garg Tube Export LLP and Garg Tube Limited; 2017-2018," dated January 9, 2020 (Final Analysis Memorandum), at 288 (containing the log of the margin calculation program providing statistics on the type of normal value comparisons).
[34] *See Final Results* IDM at Comment 7. Domestic interested parties are Independence Tube Corporation and Southland Tube, Incorporated (Nucor companies).
[35] *See Remand Order* at 11-12.

determination, Commerce must (1) "demonstrate the existence of each market phenomenon and support its determination with substantial evidence"; (2) "explain how these market phenomena create a PMS, *i.e.*, a unique set of facts distorting the cost of materials and fabrication or other processing in the country"; and (3) "demonstrate that this PMS renders the cost of materials and fabrication inaccurate."[36]

Applying that standard to the *Final Results*, the CIT first found that Commerce supported with substantial evidence its determination "that a variety of factors exist in the Indian market that affect the price of HRC."[37] In particular, the Court found that Commerce supported with substantial evidence its findings that the global steel overcapacity crisis persisted during the POR and created "serious market distortions resulting in negative effects and downward pressure on the global steel market"; that subsidies to hot-rolled coil producers were further "evidence that distortions were present in the market; and that trade remedies enacted by the GOI were evidence of the distortive impact of overcapacity and the "exceptions to those remedies {are} evidence that the distortions persist in the Indian HRC market."

Next, the Court found that, despite Commerce supporting with substantial evidence its determination that a variety of factors exist in the Indian market that affect the price of hot-rolled coil, "Commerce fails to explain how the cumulative and collective impact of the market phenomena upon which it relies are unique to the Indian market and therefore constitute a PMS."[38] The Court held that global excess capacity "is not a unique market phenomenon," nor are "the existence of trade remedies and subsidies" and "the exceptions to the imposition of trade remedies."[39]

---

[36] *Id.* at 12 (citing section 773(e) of the Act).
[37] *Id.* at 20.
[38] *Id.* at 20-21.
[39] *Id.*

9

Finally, the Court also found that Commerce failed to explain "how the alleged PMS distorts the cost of production so that Garg Tube's reported costs of production are not accurate in the ordinary course of trade."[40] In this regard, the Court found that the statutory language, "if a particular market situation exists such that the cost of materials . . . does not accurately reflect the cost of production in the ordinary course of trade," uses a causal phrase, *i.e.*, "such that."[41] The Court found that Congress's use of this causal phrase "requires that in addition to finding unique market phenomena {that gives rise to a PMS finding}, Commerce must demonstrate that those market phenomena prevent the cost of materials and fabrication from accurately reflecting the cost of production."[42] Specifically, the Court found, Commerce must identify what unique factors render the cost of materials and fabrication an inaccurate reflection of the COP in the ordinary course of trade, using a methodology that comports with its statutory mandate and provides a reasoned explanation supported by substantial evidence."[43]

On remand, the CIT ordered that Commerce must either "reconsider its determination or explain how the combination of each of the market phenomenon upon which it relies creates a PMS in the Indian hot-rolled coil market such that the cost of materials . . . does not accurately reflect the COP in the ordinary course of trade and support its explanation with substantial evidence."[44]

3. Analysis

As summarized above, in the *Final Results*, Commerce found that "global overcapacity will manifest its distortive effects differently in different markets" and that the PMS need not be

---

[40] *Id.* at 21.
[41] *Id*. at 15.
[42] *Id*.
[43] *Id*.
[44] *Id*. at 22.

"uniquely confined to a single country."[45]  While Commerce found in the *Final Results* that India's specific response to the global steel overcapacity crisis (*e.g.*, subsidization, imposition of trade remedies and exceptions thereto, etc.) gave rise to a PMS with respect to the price of hot-rolled coil in India, we acknowledge the Court's holding that global excess capacity "is not a unique market phenomenon," nor are "the existence of trade remedies and subsidies" and "the exceptions to the imposition of trade remedies."[46]  Therefore, under respectful protest, we reconsidered our analysis in light of the *Remand Order*.  Because the Court determined that the market phenomena relied upon in the *Final Results* are not unique to India (and thus not a PMS), we are no longer finding that a PMS existed in India during the period of review with respect to the price of hot-rolled coil.

In the *Final Results*, Commerce also found that the PMS distorted hot-rolled coil prices in India "such that they do not accurately reflect the COP of pipe and tube in India in the ordinary course of trade."[47]  However, the Court held that Commerce may not assume that these distortions "automatically render the market unsuitable for comparison" and instead must explain "how the alleged PMS distorts the cost of production so that Garg Tube's reported costs of production are not accurate in the ordinary course of trade."[48]  As noted above, we are no longer finding that a PMS existed in India during the period of review with respect to the price of hot-rolled coil.  Therefore, while we respectfully disagree that we have not shown that Garg Tube's COP does not accurately reflect costs in the ordinary course of trade, we consider this issue moot.

---

[45] *See Final Results* IDM at 23.
[46] *See Remand Order* at 21.
[47] *See Final Results* IDM at 29.
[48] *See Remand Order* at 21.

11

*Regression Analysis*

1. <u>Background</u>

In the *Final Results*, Commerce noted that when it makes a cost-based PMS determination, the statute does not mandate how Commerce may use "another calculation methodology" to establish the cost of materials and fabrication of the merchandise covered by the scope of an order.[49] As a result, Commerce established "another calculation methodology" where it adjusted Garg Tube's reported costs of production to account for distortions in input costs based on a determination of a cost-based PMS.[50] Specifically, in the *Final Results*, in quantifying the adjustment for the distortions in the Indian hot-rolled coil market, Commerce relied on one of the OLS models submitted by the domestic interested parties that regressed domestic hot-rolled coil prices from eight countries. Using this model, we calculated a PMS adjustment factor by relying on the estimated regression coefficient for the "uneconomic capacity" explanatory variable, derived from the OLS regression analysis, and using a capacity utilization rate of 80 percent as a desired reduction of the uneconomic capacity.[51] As a result, Commerce increased Garg Tube's reported hot-rolled coil costs by 10.30 percent to account for the cost-based PMS that Commerce found to have existed in India during the POR.[52]

As a result of the Court's decision in *Garg Tube I*, Commerce in its First Redetermination did not make a PMS adjustment to Garg Tube's COP for purposes of the sales-below-cost test but continued to apply a PMS adjustment (using the above-described methodology) when calculating COP where normal value is based on constructed value.

---

[49] *See Final Results* IDM at Comment 7.
[50] *Id*.
[51] *Id*.
[52] *Id*.

    2.  Remand Order

In the *Remand Order*, the Court held that Commerce's decision to quantify a PMS adjustment using an OLS model was reasonable. The Court also found that Commerce reasonably relied on the regression coefficient for uneconomic capacity (rather than a counterfactual price informed by multiple unrelated explanatory variables) because it captures the impact of global overcapacity on Indian hot-rolled coil prices.[53] Therefore, the Court found that "Commerce articulates a rational connection between its decision to use an {OLS} regression model to quantify a PMS adjustment via the regression coefficient for uneconomic capacity and the record evidence."[54]

The Court determined, however, that "Commerce's application of its selected methodology via the OLS Regression Model is unsupported by substantial evidence because Commerce does not adequately address record evidence detracting from the validity of the OLS Regression Model."[55]

First, the Court noted that "both Commerce and {the domestic interested parties} rely upon *Wooldridge, Econometrics*,[56] to explain that the validity and efficiency of an {OLS} linear regression for time series data are informed by whether the input data returns results which satisfy the Gauss-Markov assumptions."[57] The Court continued that, "{f}or {OLS} regressions based on time series data, the Gauss-Markov assumptions require the model to be linear in parameters, have no perfect collinearity between the explanatory variables, have an error term with a population mean of zero, have no serial correlation, have a constant variance of the error

---

[53] *See Remand Order* at 26.
[54] *Id.* at 25-26.
[55] *Id.* at 27.
[56] Jeffrey M. Wooldridge, Introductory Econometrics A Modern Approach 68 (South-Western Cengage Learning 5th ed.) (2013) (*Wooldridge, Econometrics*).
[57] *See Remand Order* at 27.

term over time, and have normality."[58]  In light of Garg Tube's challenge that the chosen regression model does not satisfy the Gauss-Markov assumptions, which guarantee that it is the best linear unbiased estimator for the data set chosen, the Court found that Commerce did not explain whether and to what extent a significant reduction in the number of selected countries impacted the model in question.[59]

Specifically, the Court noted that Commerce switched in the *Final Results* to an OLS regression model that regressed domestic hot-rolled coil prices for eight countries, while it relied in the *Preliminary Results* on an OLS regression model that regressed import values for hot-rolled coil for 38 counties.[60]  Considering this change in the *Final Results*, the Court found that "{a} significant reduction in the sample size without further explanation calls into question whether the eight remaining countries are a representative sample of the population or cherry-picked to favorably manipulate the results of the OLS Regression Model."[61]  The Court determined that "{w}ithout further explanation, {it} cannot determine if Commerce's decision is reasonable."[62]

Second, the Court held that Commerce, in finding that there is an inverse relationship between steel overcapacity and hot-rolled coil prices, failed to address a study that Garg Tube submitted "contradicting" such an inverse relationship."[63]  The Court held that because Commerce's use of the regression coefficient for uneconomic capacity "stems from its belief that the global overcapacity crisis is the primary cause of the PMS in India," Commerce is required to

---

[58] *Id*. at 27-28 (citing *Wooldridge, Econometrics* at 87-88, 94-96, 118, 349-355, 374, and 853-854).
[59] *Id*. at 28.
[60] *Id*.
[61] *Id*. at 28-29 (citing *Wooldridge, Econometrics* at 324-326).
[62] *Id*. at 29.
[63] *Id*.

14

address this detracting evidence to continue relying on the regression coefficient for uneconomic capacity to calculate the PMS adjustment.[64]

Third, the Court found that Commerce did not adequately respond to Garg Tube's arguments that call into question the stability of the OLS regression model, due to its over-inclusive reliance on one demand-side explanatory variable and omission of other demand-side explanatory variables.[65] Observing that Commerce relied on gross fixed capital formation (GFCF) as an explanatory demand-side variable, the Court found that Commerce was required to consider Garg Tube's assertion that the OLS model's omission of fiscal, monetary, and taxation demand-side explanatory variables introduced an omitted variable bias (which was a violation of the Gauss-Markov "zero conditional mean assumption"), thus calling into question the model's validity.[66] The Court found that it "cannot determine if Commerce's decision to exclude variables for fiscal, monetary, and taxation policies is reasonable because Commerce does not explain whether the variables are relevant or whether their omission introduced an unacceptable amount of bias into the regression."[67] On remand, the Court ordered Commerce to "explain what impact, if any, the exclusion of these variables has on the OLS regression model" and to make any appropriate adjustments based on that explanation.[68]

Fourth, the Court found that Commerce failed to address evidence submitted by Garg Tube "demonstrating that changing the time period analyzed by the regression significantly impacts the relationship between the explanatory variable and dependent variable."[69] In this regard, the Court found that the proffered evidence suggests that "{d}epending on the time

---

[64] *Id*.
[65] *Id*. at 30.
[66] *Id*. at 30-31 (citing *Wooldridge, Econometrics* at 88-98, 350-351, and 845).
[67] *Id*. at 32.
[68] *Id*. at 32-33.
[69] *Id*. at 33.

15

period examined, the direction of the relationship between uneconomic capacity and {hot-rolled coil} price changes."[70] The Court further held that "{t}he directional change in the relationship depending on the time period examined suggests a correlation between time and uneconomic capacity." The Court thus held that Commerce must either reconsider or further explain its determination by addressing Garg Tube's "argument regarding the correlation between the explanatory variables."[71]

   3. Analysis

Because Commerce is, under respectful protest, no longer finding that a PMS existed in India during the POR with respect to the price of hot-rolled coil, the issues the Court identified regarding the regression analysis are moot at this time.

**III.   COMMENTS ON DRAFT RESULTS OF REDETERMINATION**

On May 13, 2022, Commerce issued its Draft Second Redetermination and provided interested parties an opportunity to comment on Commerce's analysis and redetermination.[72] Commerce received comments from Garg Tube[73] and Nucor Tubular Products Inc. (Nucor), the domestic interested party.[74] These comments are addressed below. After considering Garg Tube's and Nucor's comments, we made no changes to our conclusions in the Draft Second Redetermination for these final results of redetermination.

---

[70] *Id*.
[71] *Id*. at 34.
[72] *See* "Draft Results of Redetermination Pursuant to Court Order, *Garg Tube Export LLP and Garg Tube Limited v. United States*, Court No. 20-00026, Slip Op. 22-18 (CIT March 11, 2022)," dated May 13, 2022 (Draft Second Redetermination).
[73] *See* Garg Tube's Letter, "Comments on Draft Remand:  Antidumping Duty Order on Welded Carbon Steel Standard Pipes and Tubes from India," dated May 20, 2022 (Garg Tube's Comments on Draft Results of Redetermination).
[74] *See* Nucor's Letter, "Welded Carbon Steel Standard Pipes and Tubes from India:  Comments on Draft Results of Redetermination," dated May 20, 2022 (Nucor's Comments on Draft Results of Redetermination).

*Garg Tube's Comments*

- Garg Tube fully supports Commerce's Draft Second Redetermination finding that no PMS existed in India during the POR with respect to the price of hot-rolled coil, which resulted in the recalculation of Garg Tube's weighted-average dumping margin at zero percent.[75]
- Garg Tube requests that Commerce finalize the Draft Second Redetermination when filing the final results of redetermination with the Court, because it complies with specific Court's instruction concerning the manner in which Garg Tube's weighted-average dumping margin is to be calculated.[76] The weighted-average dumping margin calculated in the Draft Second Redetermination for Garg Tube is supported by substantial evidence and in accordance with law.[77]

*Nucor's Comments*

- Commerce's findings in the underlying review are supported by the record and continuing to find that a PMS existed in India during the POR with respect to the price of hot-rolled coil is consistent with the Court's *Remand Order*.[78]
- The Court did not find that a PMS could not have existed in India during the POR, but rather that Commerce "must demonstrate the existence of each market phenomenon and support its determination with substantial evidence."[79]
- In the underlying review, Commerce explained that its PMS adjustment quantifies and isolates the effects of global steel overcapacity crisis on the Indian hot-rolled coil market.[80]
- That distortions under the PMS provision existed in one market does not preclude the same distortions from having existed in another market. The distortions may have manifested differently within each market, and the manner in which a national government and its steel industry acted in the face of that crisis further differentiates the impact at the national market level. Thus, Commerce correctly determined in the underlying review that global steel overcapacity existed during the POR and that it distorted hot-rolled coil prices in India.[81]
- The existence of India trade remedy measures and domestic subsidies also supports the finding of a PMS because the Indian government recognizes the distortive effects that imports were having on hot-rolled coil prices in India.[82]
- Moreover, Indian pipe and tube producers did not pay antidumping duties on imported hot-rolled coil, which means that measures imposed to offset these distortive effects were absent from the COP for Indian pipe and tube producers.[83]

---

[75] *See* Garg Tube's Comments on Draft Results of Redetermination at 2.
[76] *Id*.
[77] *Id*.
[78] *See* Nucor's Comments on Draft Results of Redetermination at 5.
[79] *Id*.
[80] *Id*. at 6.
[81] *Id*. at 6-7.
[82] *Id*. at 7.
[83] *Id*.

- These are uniquely Indian measures that had a distinct impact on the prices of hot-rolled coil in India and contribute to a distinctly Indian PMS.[84]
- In addition, Commerce found that hot-rolled coil producers received domestic subsidies that exerted downward pressure on hot-rolled coil prices in India. These too were uniquely Indian subsidies that further substantiated the existence of a PMS in India.[85]
- The regression analysis offers further support of a PMS finding in India because it demonstrates the existence of a PMS in a particular market and for individual producers as well as the specific distortive impact of that PMS on COP.[86]
- A fuller explanation of how the individual PMS factors present in the Indian market combine to result in specific distortions to the Indian market and to individual Indian producers, which can be supplemented by the results of the regression analysis itself, allow Commerce to fully support a continued finding of a PMS in India.[87]
- Alternatively, finding that a PMS existed in the Indian market is further supported by Commerce's authority under section 773(f)(1)(A) of the Act. Under this provision, Commerce can adjust reported costs when circumstances such as the existence of a PMS do not accurately reflect the actual costs incurred.[88]
- Commerce routinely adjusts costs under section 773(f)(1) of the Act on other bases, such as for non-recurring costs, start-up costs, and the major input rule.[89]

**Commerce's Position:**

Nucor urges Commerce to provide a "fuller explanation" to support its PMS determination on remand, consistent with the Court's *Remand Order*.[90] However, the "fuller explanation" proposed by Nucor is essentially the same as what Commerce already provided in the *Final Results*. For example, Nucor argues that a PMS need not be confined to a single market and that distortions caused by global steel conditions will manifest differently in different markets.[91] Nucor argues that global steel overcapacity distorted hot-rolled coil prices in India during the POR and that India's specific responses to this distortion (*e.g.*, imposition of trade remedies, exceptions from the payment of remedial duties, and subsidization of steel producers)

---

[84] *Id*. at 8.
[85] *Id*.
[86] *Id*.
[87] *Id*. at 9.
[88] *Id*.
[89] *Id*.
[90] *Id*.
[91] *Id.* at 6-7.

contributed to a "distinctly Indian PMS."[92]  According to Nucor, the regression analysis further isolates the unique impact of the PMS in the Indian hot-rolled coil market.[93]

As summarized above, Commerce already provided this analysis in its *Final Results*.[94] Indeed, in its comments, Nucor cites to the *Final Results*.  Nucor does not explain how it is consistent with the Court's *Remand Order* to continue to rely on an analysis that the Court already found to be unsupported by substantial evidence.  In this regard, the Court held that global excess capacity "is not a unique market phenomenon," nor are "the existence of trade remedies and subsidies" and "the exceptions to the imposition of trade remedies."[95]  Although the Court did not explicitly address the fact that the regression model is unique to India, that model is intended to quantify the impact of specific market phenomena on prices; it is not itself a "unique market phenomenon" that would, on its own, support a PMS determination.

Nucor argues, in the alternative, that Commerce should rely on section 773(f)(1)(A) of the Act to find a PMS.  According to Nucor, this provision "authorizes {Commerce} to adjust reported costs when accounting practices or other circumstances, such as the existence of a PMS, do not accurately reflect the actual costs incurred."[96]  Nucor's proposal does not address the Court's finding in the *Remand Order* that Commerce did not "explain how the cumulative and collective impact of the market phenomena upon which it relies are unique to the Indian market and therefore constitute a PMS."[97]  In other words, because the Court found that Commerce failed to adequately support its determination that a PMS existed during the POR with respect to

---

[92] *Id.* at 7-8.
[93] *Id.* at 8-9.
[94] *See supra* at 5-8.
[95] *See Remand Order* at 21.
[96] *See* Nucor's Comments on Draft Results of Redetermination at 9.
[97] *See Remand Order* at 20-21.

the price of hot-rolled coil, it is irrelevant how Commerce might have adjusted for a PMS under the statute.

Therefore, for reasons explained above, we disagree that Commerce should continue to find that a PMS existed in India during the POR with respect to the price of hot-rolled coil and our Draft Second Redetermination remains unchanged in these final results of redetermination.

### IV. FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Order*, based on the analysis described above, Commerce recalculated Garg Tube's weighted-average dumping margin by removing a PMS adjustment when calculating the COP where normal value is based on constructed value.[98] Garg Tube's recalculated weighted-average dumping margin for purposes of these final results of redetermination is as follows:

| Exporter or Producer | Final Results of Review<br><br>Weighted-Average Dumping Margin[99] | First Redetermination<br><br>Weighted-Average Dumping Margin[100] | Final Results of Second Redetermination<br><br>Weighted-Average Dumping Margin[101] |
|---|---|---|---|
| Garg Tube Export LLP and Garg Tube Limited | 11.83 | 1.73 | 0.00 |

6/8/2022



X _____

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
 for Enforcement and Compliance

---

[98] *See* Memorandum, "Welded Carbon Steel Standard Pipes and Tubes from India: Draft Results of Redetermination Calculation Memorandum for Garg Tube Export LLP and Garg Tube Limited," dated May 13, 2022 (Garg Tube's Draft Redetermination Calculation Memorandum).
[99] *See Final Results*, 85 FR at 2716.
[100] *See* First Redetermination at 33.
[101] *See* Garg Tube's Draft Redetermination Calculation Memorandum.